STATE OF MISSOURI, Respondent, *v.* MATHEW LEWIS, Appellant.

### June 26, 1883.

1. CRIMINAL LAW — DELIBERATION. — Mere excitement of the accused at the time of the homicide does not negative the idea of deliberation.

2. —— DEGREES OF MURDER. — Provocation by words which will reduce the grade of a homicide from murder in the first to murder in the second degree, must be caused by words of the victim.

3. —— PREMEDITATION — INSTRUCTIONS — PRACTICE. — An instruction which erroneously defines "premeditatedly" as "thought over," is not ground for a reversal where there is no evidence of any degree of homicide other than murder in the first degree.

4. —— PRACTICE. — It is not error to refuse to allow the jury, in the sheriff's custody, to visit the place of the homicide.

APPEAL from the St. Louis Criminal Court, LAUGHLIN, J. *Affirmed*.

C. O. BISHOP, for the appellant; Deliberation can not be presumed, but must be proved. — *Murray* v. *The Commonwealth*, 79 Pa. St. 311. As to the test of sufficiency of provocation. —See 2 Bishop Cr. L., sect. 710 ; *The State* v. *Will*, 1 Dev. & Bat. 167–169. The instruction defining murder in the first degree is fatally erroneous. —*The State* v. *Peyton*, 12 Mo. App. 568 ; *The State* v. *Rose*, 12 Mo. App. 567 ; *The State* v. *Ellis*, 74 Mo. 207 ; *The State* v. *Kotovsky*, 74 Mo. 247.

JOSEPH R. HARRIS, for the respondent.

BAKEWELL, J., delivered the opinion of the court.

Defendant was convicted of murder in the first degree, for killing his wife, Mary Ann Lewis, in St. Louis, on the 13th of October, 1876.

The defence was an *alibi;* in support of which, several witnesses were examined. The entire testimony has been read with care. The defendant's case was a very weak one. Though six years and a half from the date of the homicide had elapsed before the trial, and many persons who would otherwise have been summoned for the state as present at the time of the occurrence, were dead or gone to parts unknown, the testimony for the state was overwhelming, that defendant was the man who committed the homicide.

It appears from the testimony that the deceased and the defendant were persons of color, and husband and wife. The deceased was a young woman of twenty-two, of slight frame ; the defendant, a heavy built man of middle age. The deceased was employed during the day as house-servant in a house of prostitution inhabited by white women. The defendant frequently before the homicide, and on the

morning of that day, and on the day before, told his wife that he would kill her. He told other persons that he would cut her throat; and especially on the morning of the homicide told a negro associate, who remonstrated with him for his cruelty to his wife, that he had made up his mind, and that he would cut her throat before nightfall. The wife slept at nights with her sister in a tenement house in a room occupied by her sister, also occupied by a colored man and his wife. The night before the homicide, the defendant assaulted his wife in bed with a knife. During the morning of the homicide he sharpened and exhibited two knives with which he said he would cut her throat. About dusk on the evening of Friday, October 13th, before the street lamps were lit, but after the lights were lit in the neighboring stores, defendant, who was loitering in front of the passage-way which led from the street to the room in the tenement building where his wife slept at night, saw her coming down the street with a pitcher in her hand. He walked towards her, the handle of his knife sticking out of his pocket, and as he approached her, a colored man, whom they both knew, spoke to her. She returned the salutation of this colored man, and held out her hand to him. Defendant came up and said: "I thought I had told you not to speak to your sons of bitches," and struck her a blow with his fist, behind the ear, which caused the blood to spurt from her face. She fell upon her knees, and said: "Mat, is it any harm to speak to people?" He ordered her to go into the house. She said that the white people had sent her for beer. He told her to go and get it and come back. She went to the beer saloon at the corner. Whilst she was gone, the women who gathered round remonstrated with defendant for his cruelty. When his wife came back he ordered her into the house again. He then said: "You damned bitch, I am going to kill you, near as it is to night, before the lamps are lit." She was afraid to go in and beg-

ged Emma Horner, — not present at the trial,— one of the women of her color standing by, to go with her. Deceased wanted first to carry the beer to her employers; but this woman suggested that she was too bloody. Defendant then went up the passage-way followed by the deceased, who came along holding to the apron of the woman Horner. Screams were immediately heard, and the deceased ran out holding her hands to her throat from which the blood was spouting. She ran to the nearest drug store; then came back, and rolled on the sidewalk till the ambulance wagon took her to the dispensary where she died within an hour of the occurrence. She was told by the physician on her arrival that her case was hopeless, and she herself said she was dying. An officer who was present was, by the state, put on the stand to testify as to her dying declarations, but the question was not pressed. It does not appear why, as it would seem that the foundation was sufficiently laid, and that the woman was well aware that she had but a few minutes to live. Defendant went at once to the house of an acquaintance in another part of the city, where he stated that he had cut his wife, and expected her to die, and asked advice as to the best method of getting out of town. He was arrested at Washington, Missouri, eleven months after the homicide.

1. It is contended that the trial court erred in refusing to instruct as to murder in the second degree, inasmuch as there was evidence tending to show a want of deliberation, and an immediate provocation calculated to produce heat of blood or passion. If this means that if a man orders his wife into the house, to butcher her at his leisure, and then cuts her throat as soon as she is off the street, if he chance to be in a bad humor at the time, this is not murder in the first degree, it is not the law. If it does not mean this, we are at a loss to see what it does mean in view of the evidence. We see no evidence tending to show any provocation

calculated to rouse the fury of anybody but a mad man. The deceased herself seems to have been timidly submissive. And if, after he had struck her down, something was said by the surrounding women not calculated to soothe the feelings of the man who dealt the blow, nothing of this kind can palliate the subsequent offence, or reduce to a lower grade of murder the act of inviting or ordering her into the house and immediately cutting her throat in the passage. It is true, that deliberation is essential to murder in the first degree, and that the supreme court defines deliberation to mean " in a cool state of the blood ;" but, by this cool state of the blood, is meant by the supreme court, as we are told in *The State* v. *Ellis* (74 Mo. 207), " not in a state of passion engendered by reasonable provocation." " If, " says Judge Hough, in that case, " at common law, precisely the same state of mind which, when produced by a blow, will constitute the killing manslaughter, is produced by such grievous and degrading words of reproach as are naturally and justly calculated to produce that state of mind, the instant killing in such a state of mind, of the provoker, will be murder. * * * The decision of this court also declared it to be murder ; but not murder in the highest grade ; because in such a case, although there may be premeditation as defined by this court, there is no deliberation within the meaning of the law. * * * What words of reproach and attendant circumstances will be deemed a just cause of provocation, and constitute the homicide murder in the second degree, is, in every case a question of law for the court." Endeavoring, as we shall always do, closely to follow the rulings and intimations of the supreme court in distinguishing between the two degrees of murder under the statute, we think that where a man deals a violent blow to his wife, who thereupon falls upon her knees before him using words only of excuse and submission, if the bystanders express their opinion of the man's brutality in rough

language, and he thereupon orders her into the house and then and there, and in precise accordance with his previously declared intention, cuts her throat in the alley-way, though he may have been laboring under some mental excitement at the time, superinduced by his own violence, and perhaps increased by the language of the bystanders, there was nothing in these circumstances, or in such language, which will be deemed a just cause of provocation, and constitute the homicide murder in the second degree. We take it, that the provocation by words which will reduce the homicide from murder in the first, to murder in the second degree, and show the absence of "deliberation" as now defined, must be a provocation moving from the victim of the homicide; and that the mere fact that the murderer was "excited" at the time does not negative the idea of deliberation.

2. The instruction as to murder in the first degree was erroneous, because it defined "premeditatedly" as meaning "thought over." This is declared to be error in *The State* v. *Ellis* (74 Mo. 221). But the error was harmless, because, as we have said, there was no evidence of any other homicide than murder in the first degree; the element of deliberation was shown by uncontradicted testimony, and there was no room for any instruction as to the lower grade of murder.

3. We see no error to the prejudice of defendant in the matter of the admission of evidence. The testimony as to threats by defendant to kill deceased, made within two days of the homicide and on the day itself, and of an attempt to cut her the night before, was competent, not as part of the *res gestæ* of the transaction, but because, from these threats, and the other circumstances in evidence, a fair inference of malice might be drawn. The testimony of the policeman McMahon was properly admitted to show that the dying woman realized her condition. This testi-

mony did not become incompetent from the fact that the state neglected to utilize it by proceeding to inquire as to any dying declarations, for which we think a sufficient foundation was laid. Of this the defendant can not complain. The witness Griffith was asked where he last saw defendant, to which he gave an answer not responsive to the question of the prosecuting attorney. This ought not to be regarded as prejudicial to the state. The court at once ordered the answer stricken out.

4. The court gave two instructions as to the defence of *alibi*. These instructions were not inconsistent; and we do not see that they furnish any ground for complaint on the defendant's part. Of one of them the state, perhaps, might have complained with some reason.

5. Counsel for prisoner, before the cause was submitted, asked that the jury be permitted, in proper custody, to view the place where the homicide was committed. If this had appeared to the court to be important for enabling the jury to understand the testimony, it might have been well enough to permit it. But it was certainly no error to refuse the application, especially six years and a half after the offence. Judge Napton, in *The State* v. *Sanders* (68 Mo. 205), intimates a doubt whether, in Missouri, the jury in criminal cases can be allowed to view the place where the crime was committed, for the purpose of determining as to the credibility of the statements of the witnesses. In the present case, I can not see what light such a visit could have thrown upon the case, even supposing that the premises remained unchanged as to the position of the staircase, and the manner in which the passage-way was lighted.

No ground appears for disturbing the judgment. With the concurrence of all the judges, it will be affirmed.