# Court of Appeals.

April 21, 1896.

## PEOPLE v. MARIE BARBERI.

1. HOMICIDE—MURDER IN THE FIRST DEGREE.

Where the defendant inflicts the wound in a sudden transport of passion, excited by what the deceased then said, and by the preceding events which, for the time, disturbed her reasoning faculties and deprived her of the capacity to reflect, or while under the influence of some sudden and uncontrollable emotion, excited by the final culmination of her misfortune, the act does not constitute murder in the first degree.

2. SAME—EVIDENCE.

In such case, the defendant is entitled to the benefit of all testimony that has a legitimate bearing upon her mental condition, and to have the jury correctly instructed by the court with respect to the principles of law that govern the inquiry.

3. SAME.

The relations of the parties which preceded the act are competent for the consideration of the jury, since they are connected therewith, and are of such a nature and character as to produce a powerful influence upon the mind when recalled at the moment that the defendant heard the final refusal of the deceased, expressed in the most insulting and provoking language.

4. SAME,

The defendant is not compelled to let the facts rest upon her unsupported testimony, but has the legal right to sustain and corroborate, if she can, her version of them by the testimony of disinterested witnesses to the same facts or any of them.

5. TRIAL—OBJECTIONS—WAIVER.

The district attorney can waive a technical rule of evidence relating to the mode of proving a material fact or of corroborating facts testified to by

the accused by failing to interpose the proper specific objection at the proper time.

**6. SAME—INSTRUCTIONS.**

Instructions, which exclude from the consideration of the jury all the facts and circumstances preceding the homicide, and of which that act was but the culmination, are erroneous.

**7. COURT OF APPEALS—SECTION 528 OF THE CRIMINAL CODE.**

An erroneous statement of the law, for improper comments upon facts or the evidence bearing upon them, may be reviewed and corrected in the court of appeals in a capital case without any exception, when it can be seen that they may have operated to the prejudice of the accused.

Appeal from a judgment convicting the defendant of murder in the first degree.

Marie Barberi was convicted of murder in the first degree, and appeals.

Frederick B. House, for appellant.

John D. Lindsay, for the People.

O'BRIEN, J.—The defendant was convicted of the crime of murder in the first degree, in causing the death of one Domenico Cataldo on the morning of the 26th of April, 1895. The place where the homicide was committed was in an Italian saloon in the city of New York, and the manner in which the offense was perpetrated was by cutting the throat of the deceased with a razor, which the defendant at some time procured from his trunk, and brought with her to the saloon. The act was committed publicly, in the presence of several persons, at about 9 o'clock in the morning, and there is no dispute whatever in regard to the fact that the defendant then and there inflicted the wound in the manner stated, which almost immediately produced the death of the deceased. The proof on the part of the people was confined to the act of the defendant producing the death, and her declaration at the time or immediately thereafter. The defendant was sworn as a witness in her own behalf, and it is from her statement alone that we are enabled to obtain any clear or connected view of the circumstances and events which preceded and produced the tragedy.

The defendant and the deceased were natives of Italy, having

resided in New York but a few years, and at the time of the com-
mission of the homicide the former was about 22 and the latter
about 27 years of age. The deceased had a bootblacking stand at
the corner of Elm and Canal streets, where he personally attended
to that business. The defendant was the daughter of a tailor, and
she was herself employed in an establishment at that business, thus
contributing to her support and that of the family. Her parents
resided in Elizabeth street, and, in going to and from her place of
employment, she passed the stand where the deceased carried on
his business and was generally to be found. It appears that he had
frequently noticed the girl, and finally, without any formal in-
troduction, spoke to her, and in that way sought her acquaint-
ance. This was about a year and a half before his death. At a
very early stage of the acquaintance thus formed, he avowed his
intention to call upon her parents, and seek her hand in marriage,
—a proposition which she did not discourage, if, indeed, it did not
receive her approval and consent. The parties met upon these
terms from time to time during some months following, the de-
ceased frequently walking with the defendant from his place of
business to the entrance of the shop where she was employed.
During this time the defendant called his attention to the fact that
he had not kept his promise to call upon her parents, and ask her
in marriage; and, upon receiving evasive or unsatisfactory an-
swers, the girl, in order to avoid passing his place of business or
meeting him, changed her route to and from home, still being em-
ployed in the same tailoring establishment. The deceased, some
time after the change, was found waiting for her at the door of
the shop where she was employed, and walked with her towards
her home. In this interview the deceased urged the defendant to
resume the old route, and pass by his stand as formerly, so as to
enable him to see her, still avowing his intention to call upon
her parents, and obtain their approval of the contemplated mar-
riage; and, upon his promise to do so, she consented, and compli-
ed with his request. During the interviews which followed for
some months afterwards, the deceased frequently urged the defen-
dant to marry him, and at last suggested such marriage without
the consent of her parents, at which she became indignant, and
left her employment in the shop, in order, as she says, to get rid

of him. Some time afterwards, she obtained employment in another shop, in another part of the city. It appears that the deceased learned in some way where she was, and one day, when leaving her work for the day, about noon, she found the deceased at the door, waiting for her, and, at his invitation, she accompanied him for a walk. He took her to a saloon on Chrystie street, where they had some soda, after which they parted. The intimacy between the parties formed on the street, as described, and interrupted for a short time by the defendant, in changing her place of employment, in order to terminate it, was thus resumed and continued for some months, till the 28th of March, 1895, when an event occurred which precipitated, or, rather, was the principal cause of the tragedy. On that day, for some reason not important to ascertain, the defendant's duties in the shop terminated about noon. The deceased met her there, and invited her to take a walk with him, and she accepted the invitation. It may be fairly inferred that by this time the defendant had overcome he objections to marrying the deceased without the express approval of her parents, and, during their walk about the city, he called her attention to various places where there were furnished rooms advertised, pointing out one or more apartments that he thought would be suitable for them. There is nothing in the record to show that the defendant understood these suggestions as implying anything save her approaching marriage, and there are many circumstances to indicate that such was her understanding, as well as the idea that the deceased wished to convey to her. It appears that he so arranged the walk as to arrive in a short time at the same saloon in Chrystie street already mentioned, where he called for soda for the defendant, and some other drink for himself, each seated at separate tables, at his suggestion. The soda was served to the defendant by the person at the bar, and some other liquid to the deceased, but just what it was does not appear. After the defendant had drunk a portion of the glass of soda, the deceased came to her table, and requested her to taste the liquid in his glass She complied, but found the taste disagreeable, and refused to drink it; but the deceased persuaded her to mix it with the soda, as it would improve it, and he then poured a portion of the substance in his glass into the soda,

and she drank about half a glass of the mixture. According to the statement of the defendant, the inference is warranted that this was some drug that had a powerful effect upon her both physically and mentally. The defendant was then taken by him to a house near the saloon, and at his invitation, but apparently after some hesitation, she accompanied him upstairs, where a woman appeared, who directed them to a room, into which they entered, and he locked the door. They remained in the room about three hours, and the deceased had intercourse with the defendant, by means of either force or fraud, according to her statement. He then suggested that they leave the place, and she refused to go until they were married; but he finally succeeded in persuading her to wait for the ceremony until he could prepare suitable apartments to live in. The deceased had money in the bank, and the defendant knew it, and she had no reason to doubt his ability to perform the promise. From this room the parties went to the defendant's home, the deceased parting with the defendant at the house, and refusing to go in and see her parents. She immediately went to bed, without disclosing to them what had happened, though her condition did not entirely escape the notice of her mother.

The following morning she concluded to go to the shop, and on the way she met the deceased, who told her he was then providing the apartments, and would then marry her. The defendant called his attention to the many promises of that kind that he had made, and reminded him that there was nothing else to do. He then said to her to keep quiet for three days longer, and then the marriage would take place. On April 1, 1895, three or four days after the events described, she met the deceased again, who said to her that the apartments were ready, to go with him, and he would marry her. On this assurance she went with him to apartments on East Thirteenth street, which, to her surprise, she found entirely empty and unfurnished. The deceased then told her to stay in the room while he went for the furniture, and then they would go to the city hall immediately, and be married. To this suggestion the defendant replied, "No furniture, first the marriage, and then everything else;" and on her expressing a desire to leave, as she says, he took her by the shoulders, threw her on the floor, and

forced her to have intercourse with him. Leaving the defendant with the housekeeper, the deceased went away, and in a short time returned with another man, bringing a couple of trunks and a bag or mattress, and subsequently an old bureau. They lived and cohabited in this room till the day of the homicide, nearly a month, the defendant every day begging him to marry her, and he promising to do so, "the next day," though, after a couple of weeks he began to interpose obstacles, objections, and sometimes refusals. His conduct in that respect produced frequent quarrels between them, the particulars of which are not disclosed. When the defendant awoke on the morning of the homicide, she asked him if he proposed to marry her that day, to which he replied, "No; I absolutely cannot marry you." She then said to him that, if he did not, she would have him arrested; and, on his starting to leave the room, she locked the door, and took the key, and placed herself at the window, apparently looking out for a policeman; but after some time the deceased prevailed upon her to allow him to leave the room, she telling him that she would follow him, and have him arrested by the first policeman she met. From this room it appears that he went directly to the saloon, and in a very short time the defendant followed him with her mother. Both of them urged the deceased to perform his promise of marriage, and considerable talk was had between them on that subject. In the course of the interview, the deceased said that, if the mother would give him $200, he would then see about the marriage. At this proposition the defendant and her mother became indignant, and the former said to him: "Wasn't you aware before that I was a very poor girl, that had no money? How is it that now you ask for money from my mother?" And the mother said: 'He wants money now. He knows we are poor, and have no money. He dishonored you, and wants money over the bargain." It appears that at some stage of this interview, but at what particular point is uncertain, the defendant left the saloon, and returned again in a very short time, and again demanded of the deceased that he marry her that very day. She then had the razor concealed upon her person, but at what time or for what purpose she took it from the trunk does not distinctly appear, though the jury might find from the testimony that she took it for the purpose of using it

upon the deceased. He refused, with the remark, "Do you think I would marry such a girl?" On her still persisting in the demand, and renewing the request, he repulsed her with a refusal, remarking that "hogs may marry." These were the last words which he spoke, for at that moment the defendant drew the razor across his throat, inflicting the fatal wound. Some other and minor incidents appear in the narrative of events which transpired between the parties during the period of about twenty months from the time that they formed the acquaintance of each other to the day of the homicide, but they are not important upon a review of the questions presented by the appeal. It is quite sufficient to say that none of them in any degree tend to palliate or mitigate the conduct of the deceased as it appears from the facts stated, or to discredit the defendant, but when considered with all the facts and circumstances, have quite a contrary tendency.

The defendant was not guilty of murder in the first degree, unless the act was perpetrated, not only with the intent to kill, but also with deliberation and premeditation. These three elements must exist in every case in order to constitute that deliberate malice and malignity of heart which is the essential ingredients of the offense. If the defendant inflicted the wound in a sudden transport of passion, excited by what the deceased then said, and by the preceding events, which, for the time, disturbed her reasoning faculties, and deprived her of the capacity to reflect, or while under the influence of some sudden and uncontrollable emotion, excited by the final culmination of her misfortunes, as indicated by the train of events which have been related, the act did not constitute murder in the first degree. People v. Conroy, 97 N. Y. 62; People v. Wood, 126 id. 249, 27 N. E. 362; Leighton v. People, 88 N. Y. 117. Deliberation and premeditation imply the capacity at the time to think and reflect, sufficient volition to make a choice, and, by the use of these powers, to refrain from doing a wrongful act. The defendant had been deceived, betrayed, disgraced, and ruined, but it is not certain that she formed the definite intention to use the weapon until she heard the final refusal of the deceased to marry her. She followed the deceased into the saloon, to make a final appeal to him to extricate her from the position in which he had placed her; and it is evident

that she had not yet lost all hope of succeeding either by persuasion or threats. It was only when this hope was gone, after his final refusal, accompanied, as it was, by insulting and brutal imputations, that might well have aroused the most violent passions, that she struck the fatal blow. If, at that moment, in consequence of what he said to her and the final culmination of the alleged wrongs of which she conceived herself to have been the victim, she became incapable of reasoning or of deliberating, the act, we think, would not constitute murder in the first degree.

The crucial question in the case was whether, at the time, her mind was in that condition; and it was, of course, one of fact, for the determination of the jury. But the defendant was entitled to the benefit of all testimony that had any legitimate bearing on that question, and to have the jury correctly instructed by the court with respect to the principles of law that governed the inquiry. The condition of the defendant's mind was not to be ascertained solely from what took place in the saloon at the time of the homicide. The relations of the parties which preceded it were competent for the consideration of the jury, since they were connected with the tragedy, and were of such a nature and character as to produce a powerful influence upon the mind when recalled at the moment that the defendant heard the final refusal of the deceased, expressed, as it was, in the most insulting and provoking language. That the defendant was then in a high state of agitation and excitement was made clear by the testimony of all the witnesses, and there is some proof tending to show that she fell upon the floor immediately after inflicting the wound. The nature and quality of the act could not be fairly judged by separating what took place within the space of a few minutes in the saloon from the train of events which preceded it, and grew out of the relations of the parties, but upon full consideration of every fact and circumstance that could reasonably be presumed to have influenced her mind. We are convinced from a careful examination of the record that there was a wide departure from these principles in the conduct of the trial. It is true that the defendant herself, when testifying as a witness in her own behalf, was permitted to give the history of her relations with the deceased, from the time that he sought and formed her acquaintance, down to time

of his death. The fair inference from the record is that she was per-mitted to relate what took place prior to the morning of the homi-cide by the grace and favor of the court, and not as a legal right. Her testimony was delivered in a foreign tongue, and reached the jury only through the medium of an interpreter; and, in that pro-cess, it may have lost much of the fullness and force which a nar-rative always derives from being transmitted directly to the court and jury in their own language. Moreover, she was a witness deeply interested in the result of the trial, and the jury were not necessarily bound to believe her statement, as they were the sole judges of the measure of credit to which it was entitled. If, there-fore, she was entitled to give the full history of the relations be-tween herself and the deceased,—and we have no doubt she was, —she could not be compelled to let the facts rest upon her unsup-ported testimony, but had the legal right to sustain and corrobo-rate, if she could, her version of them by the testimony of disin-terested witnesses to the same facts, or any of them. So long as the facts testified to by the party are not conclusively established, or admitted, they are still open to further proof. Page v. Krekey, 137 N. Y. 307, 33 N. E. 311.

After the defendant had testified generally to the facts showing the relations that had existed between herself and the deceased, and which have been briefly stated above, her counsel called a witness, and was proceeding to give proof of the same facts, or some of them, by the admissions of the deceased. There was no objections from the district attorney, but the court interposed and inquired of counsel the object of the question. The counsel re-plied that he proposed to corroborate the defendant by showing the relations between her and the deceased. The learned recorder then said : "You do not need any corroboration of those relations. The defendant stated those relations herself." Here a long col-loquy, which covers several pages of the printed record, took place between the court and the defendant's counsel, in which the purpose of the testimony was stated in various forms; and the court, in still more emphatic language, stated that it was not ad-missible, for the reasons which he had before stated, and for the further reason that it might be injurious to the accused, as affording good grounds for the prosecution to claim that her act was de-

liberate and premeditated.   The learned district attorney then interposed and stated, among other things, substantially, that it was a part of his duty, under the circumstances, to see that the rights of the accused were properly protected, and that, as the proof offered would afford abundant grounds for the prosecution to ask for a conviction of murder in the first degree, he felt it to be his duty to warn the defense that, if the proof was admitted it would be in the line of his duty to insist that the defendant's act would amount to deliberate murder.   No formal objection had yet been made to the testimony, and, the defendant's counsel still persisting in laying it before the jury, the district attorney objected to it, and his objection was sustained, and the defendant's counsel excepted.   In the course of the trial, similar proof, or proof of the same facts, or some of them, was offered by the defense from other witnesses, but it was excluded under exception.   It is important here to note the principle upon which these rulings must rest. Manifestly, the court and the prosecuting officer must have supposed either that the testimony was simply cumulative, and therefore unnecessary, or positively injurious to the defendant, and, consequently, no part of her defense.   In view of the fact that it was already before the jury from the lips of the defendant, it *is* not apparent how the latter hypothesis could have been seriously entertained.   And, as to the former, it might have been correct enough, provided the court and the prosecution were content with the defendant's version of the facts, and accepted it for all the purposes of the trial as conclusively establishing them before the jury.   But such was not the case, since in no part of the record does it appear that the prosecution admitted the facts, or in any way waived the right to question the value of her testimony with the jury.   On the contrary, it distinctly appears, as will be seen presently, that the court submitted the question of her credibility to the jury, and left it for them to determine how far her statement of the relations between herself and the deceased should be accepted as true.

It should also be observed that no question was raised at the trial, and none is now made in this court, with respect to the quality of the proof offered to establish the facts or corroborate the defendant's statements.   The ruling was directed to the competency

of the facts themselves for any purpose, and not to the mode of
proving them. The admissions or declarations of the deceased
may or not have been admissible for that purpose, depending en-
tirely upon circumstances not disclosed, and which had no in-
fluence upon the decision. It may be that it would have to appear
that they were so related or connected, in point of time or other-
wise, with the principal fact, as to be a part of the res gestae, and
thus within the exceptions of the rule excluding hearsay evidence.
Com. v. Densmore, 12 Allen, 535. But we are not now dealing
with that question, and do not propose to pass upon it one way or
the other. It is quite certain that the district attorney could waive
a technical rule of evidence relating to the mode of proving a
material fact, or of corroborating facts testified to by the accused,
and did waive it in this case, if it was applicable at all, by
failing to interpose the proper specific objection at the proper time,
since the counsel might then have so changed and framed the
question as to comply with all technical rules. On the question
now under review, his attitude and that of the court were iden-
tical, and that was that the facts sought to be proven were wholly
irrelevant.

In reviewing a capital case, we must be satisfied that a fair trial
has been had; and when we can see that the case has been tried
and submitted to the jury upon an erroneous theory, prejudicial
to the accused, and which had a controlling influence upon the
trial and the result, we ought to regard the principal which has
been decided, rather than the concrete form in which the question
arose and became a practical one at the trial, and should not be
astute to seek for some technical ground, not urged upon the trial
or here, to sustain the ruling. Upon an examination of the whole
record, it is plain that the case was tried upon the theory that the
relations of the parties, prior to the morning of the homicide, had
no bearing upon the question of deliberation and premeditation,
and that was the principle upon which the evidence referred to was
excluded. This will be made plainer by reference to the charge of
the learned recorder to the jury. In submitting this vital ques-
tion, he used the following language: "You are not called upon
to perform a miracle, by transferring your intelligence back to the
26th of April, when this defendant is alleged to have committed

the deed charged. You are only called upon and expected to determine, by your verdict, what was the condition of the defendant's mind at that time ; and the only way in which you can determine such condition, and the only way known to law and to reason, is by the acts of the defendant at that time ; and by those acts and from those acts you may infer the operations of this defendant's mind. That is only method known to human wisdom and intelligence, and that is the method by which you must be governed." Here the learned court stated the rules by which the jury were to be governed in determining the condition of the defendant's mind at the time of inflicting the wound that caused the death. That, of course, included her ability to reason, think, and reflect, and her general power of volition; and they were instructed that there was but one method known to the law and to reason and human wisdom for ascertaining that condition and determining these questions, and that was by considering her act at the time. These instructions excluded from the consideration of the jury all the facts and circumstances preceding the homicide, and of which that act was but the culmination. This part of the charge renders the ruling excluding the corroborating proof intelligible, but we think that both the ruling and charge were in these respects erroneous.

There is another portion of the charge which is intimately related to the questions under consideration. In speaking of the relations of the parties and the credibility of the defendant, the court said : " On another phase of this case it is but proper for me to say that, in this narration, which, if true, would put Cataldo in a bad and an unenviable light, but one being has given the narration, and that is the defendant. She is vitally interested in this case ; and it is for you to say whether a defendant, situated as this defendant is, had a motive in testifying as she did because it may be fairly claimed that the rule of action and conduct among men is that they are expected to assume the greater part of the responsibility for such acts. It is for you, in consideration of the motives that may actuate this defendant, to consider, first, being a woman, whether she would have a motive, from the instinct of delicacy, which is inherent in the sex, to palliate her own conduct, by throwing all the blame upon Cataldo; and, secondly,

whether she would have a motive in so testifying to affect your verdict, in order to escape the legitimate consequences of her act." When the court had ruled that the statement of the defendant did not need corroboration, this portion of the charge might well have been omitted. The jury were permitted to reject her testimony, although proof to corroborate her had been excluded on the ground stated. It would seem to be clear that either the ruling or the charge is wrong. The primary error, doubtless, was in refusing to permit her counsel to strengthen and re-enforce her narrative, or any material part of it, in any way that he could. Had he been allowed to do that, this passage in the charge, though the language is strong and quite unfavorable to the defendant, under all the circumstances, could be defended as embodying no legal error.

In speaking of the refusal of the deceased, at the time of the homicide, to marry the defendant, the court said to the jury, in substance, that his refusal was nothing new, and whatever effect it had upon her mind must have been produced before that day, and then proceeded as follows: "She was living with him at the time in meretricious intercourse. It was a mode of life condemned by sound public morals. Under the law of our state, however, it is not criminal; but that it was an immoral condition of life cannot and will not be disputed. This defendant, with her father and mother living in this city, left her father and mother's house, without a word of notice, and voluntarily went to live with the deceased in this meretricious life. You must draw a line of distinction between the woman who parts with her honor upon a solemn promise to marry and the woman who parts with her honor without a solemn promise to marry on the part of the man, and who continues to surrender her person to him at his will, breaks away from the moorings of her home, and goes to live with him as his mistress." We think that this part of the charge was clearly erroneous. It was the province of the jury to determine whether the refusal of the deceased, at the time of the homicide, to perform his promise, and the exasperating form in which the refusal was made or expressed, had for the time any effect upon her mental condition, or not. The words that the deceased then uttered may have extinguished the last ground of a lingering hope, and suddenly revealed to her mind her real situation. What was then said, taken

in connection with the preceding events, were causes which are sometimes known and may reasonably be supposed to operate powerfully upon the human mind; and the statement that they could not, coming as it did from the court, amount to something more than a mere expression of opinion even if that were permissible upon such a vital question. It was an instruction as to the force and effect of the evidence. But this part of the charge was open to a still more serious objection. It suggested to the jury, and submitted for their consideration, a theory of the facts which had no foundation in the evidence as it appears in the record. It could not be found upon any fair or just construction of the evidence that the defendant voluntarily parted with her honor without a solemn promise of marriage, or surrendered her person to the deceased to become his mistress. The testimony shows that there was in fact such a promise preceding these relations. It is quite clear upon the evidence in the record that he obtained possession of her person and accomplished his purpose by means of that promise, and of a series of falsehoods, and fraudulent devices of the most atrocious character. It was, at least, an open question whether her disgrace and dishonor were not effected by use of some drug which he had administered to her for the purpose of overcoming her mental and physical powers of resistance. If her testimony is to be believed.—and it must be remembered that the learned recorder ruled that it needed no corroboration,—she was decoyed into the rooms on Thirteenth street under the false pretense of an immediate marriage; and if she remained there with him, as she did, in the hope that it would be fulfilled, for a month prior to the killing, in order to hide her disgrace, or retrieve her honor, or in some way disentangle herself from the situation in which she was placed her conduct fell far short of voluntarily contracting meretricious relations with the deceased. These remark of the court upon this failure of the case were, as it seems to us, quite misleading, and could scarcely fail to have an unfavorable effect upon the jury. The attention of the court was plainly directed to these questions at the close of the charge, and they were made the subject of exception, but there was no attempt to modify, explain, or retract what had been said.

The defendant was subjected to a protracted cross-examination,

in which the same question was repeatedly asked and answered, frequently by the suggestion and direction of the court. We will not refer to the numerous incidents which the record discloses in the course of the examination by the prosecuting officer and the court, further than to say that we are wholly unable to perceive any such element of improbably in her direct narrative, or any such danger to the cause of justice to be apprehended from her statements, as to warrant such a wide and unusual departure from the ordinary and usual methods, long sanctioned, for the examina. tion of witnesses in courts of justice. But the most important feature disclosed by this part of the trial is the manner in which the testimony thus elicited was submitted to the jury. In order to get a clearer view of the action of the court in that respect, it is necessary to present at least a small part of the testimony on her cross-examination by the assistant district attorney, which is copis- ed from his brief in this court. After stating several times that the immediate cause of the act was what the deceased said to her about the hogs marrying her, the examination continued as fol- lows: "Q. Well, now, Miss Barberi, I want you to tell me, honestly and truthfully, why you killed Cataldo? A. I didn't want to kill him. Q. Well, why did you kill him? A. It was not my intention to kill him, but I was in a state of terrible agita. tion in that moment. I didn't see myself what I was doing, and when I heard that ejaculation, that word 'hogs,' I nearly lost consciousness, and I didn't know what I did. Q. Now, what did you cut his throat for? A. I didn't know, and I didn't see what I did. I was in a state of terrible exasperation, because he had insulted me atrociously; and I wanted to get married. I didn't know what had become of me. Q. Why did you cut Cataldo's, throat? A. For God's sake, I don't know what I have to say; I already said. Q. Why, Miss Barberi, did you cut Cataldo's throat? A. Because I lost consciousness, and, physically, my eyesight, in the moment that I heard him say that a hog may mar- ry me. Q. Why did you cut Cataldo's throat? A. It was not my intention to kill him. It was all in the moment, an irresistible moment, and I followed the impulse of rage, when I heard that a pig had to marry me. Q. Now, I will ask the question once more: Why did you cut Cataldo's throat? A. I never believed

that he would die. I never thought to kill him." Making every allowance for the strong temptation to color the narrative, which is always present to a witness under such circumstances, and for what it may have gained or lost in the translation, still it could not be said that there was no evidence to sustain the theory that the act was not proceeded by deliberation or premeditation. There can be no reasonable doubt that the situation in which she had been placed, and the disgrace attending it, were the constant subject of her thoughts during the preceding month, and may have preyed upon her mind. In this state of agitation, she confronted the deceased in the saloon, and the insulting refusal may have been the spark that produced the explosion. It was not impossible, under all the circumstances, to take that view of the case. At the very least, the defendant was entitled to have the question fairly submitted to the jury, and we think it was not, for reasons already stated, and for the further reason that the learned recorder, in effect, told the jury that there was no evidence to warrant the inference. In speaking to the point, he said: "You will see that the killing was not, so far as this evidence shows, a sudden act of retaliation or revenge, or resistance for an outrage upon her, or for a forcible trespass upon the person of this defendant. The killing was not the result, so far as the evidence shows, of a single refusal to marry her upon the part of Cataldo. If, as it is claimed, that this refusal of his produced a whirlwind of passion in this defendant, and, as a result of that whirlwind of passion, she killed Cataldo, you must bear in mind that he had been promising this marriage from the day on which she went with him into the house of assignation, as a free agent, and of her own accord; and his repeated promises necessarily brought repeated disappointments. So that, it was not the first time she was disappointed, because, according to her own story, the times of her disappointment went into high numbers." Apart from the very objectionable remark in which the defendant is represented to the jury as having accompanied the deceased "into the house of assignation, as a free agent, and of her own accord," which, upon the evidence, was not correct in point of fact, as already shown, the substance of the charge was that there was no evidence that the act was the result of a sudden impulse. That was the very question that the jury

had to decide, and the strong expression of opinion upon such a question, even if it was nothing more, was calculated to mislead the jury, and exceeded the limits which this court has ever sanctioned, or ought to sanction, for judicial comment upon the character and effect of evidence.

The court warned the jury in very emphatic language, and in various forms, against rendering any verdict in the case which should in any degree be based upon sympathy for the defendant on account of her sex, which, of course, was correct, as within his powers and discretion. But this was followed by a long argument to show that women, in general, are by nature capable of protecting their honor and defending their virtue, the plain tendency of which was to leave in the minds of the jury the impression that, · after all, the defendant may have been equally or more to blame for what had occurred, prior to the day of the homicide, than the deceased, and thus to excuse or palliate his conduct. The recorder concluded that branch of the charge with the following proposition: "Nature has so ordained the sexes that woman is gifted in a particular way, with greater caution and more reserve force and power, while man is gifted in a different way; and, while he may pay his court and attentions, yet nature has fitted and equipped her in such a way that she is better qualified to resist than man." The suggestion that, according to certain natural laws, woman is better qualified to resist than man was departing far from the real question in the case, and, moreover, was incorrect in point of fact, according to common experience. When that part of the charge is all read together, it is apparent that matters were discussed that are scarcely within the range of the proofs, in such a manner as to operate to the prejudice of the defendant with the jury. Those portions of the charge are also fairly covered by exceptions, and, even if they are not, an erroneous statement of the law, or improper comments upon facts or the evidence bearing upon them, may be reviewed and corrected in this court in a capital case without any exception, when it can be seen that they may have operated to the prejudice of the accused.

The questions already discussed are sufficient to dispose of · the appeal. The record discloses other rulings, arising during the conduct of the trial, that would be difficult, if not impossible, to

defend. To review them all, by attempting to point out their bearing on the issue, and in what respect they were or might have been prejudicial to be defendant, would unnecessarily extend the discussion. A careful examination of the whole charge leaves the impressions, from its general tone and entire structure, that the learned trial court, in the elaborate discussion of the facts and statement of the law, in many important particulars, passed the line which marks the limits of the judicial function. From an examination of the whole case, we are impressed with the conviction that the defendant has not had a fair trial, and that it should be submitted to another jury, to the end that all competent proof may be given in the regular and orderly way, and all the questions presented in that temperate and dispassionate manner which is so important in the trial of a capital case, and so essential to the protection of all the rights of the accused. In a recent case, the highest court of the land concluded the review of a judgment of conviction for a capital offense, where the proceedings upon the trial and the substance of the charge were much more moderate and exempt from objection than in the case at bar, with the following pertinent remarks, which are applicable here: "When the charge of the trial judge takes the form of animated argument, the liability is great that the propositions of law may become interrupted by digression, and so intermingled with inferences springing from forensic ardor that the jury are left without proper instructions, their appropriate province of dealing with the facts invaded, and errors intervene which the pursuit of a different course would have avoided." Allison v. U. S., 160 U. S. 203, 16 Supp. Ct. 252.

The judgment of conviction should be reversed, and a new trial granted.

All concur (VANN. J., in result).

Judgment reversed.