[No. 12531.  *En Banc.*  November 24, 1915.]

THE STATE OF WASHINGTON, *Respondent*, v.
JOHN GOUNAGIAS, *Appellant*.[1]

HOMICIDE—DEGREES—MANSLAUGHTER — EVIDENCE — INSTRUCTIONS.
Under the criminal code of 1909 (Rem. & Bal. Code, §§ 2390-2406),
relating to homicides which, by a process of elimination, defines man-
slaughter as the killing of a human being without justification or
excuse when (1) committed without design to effect death and with-
out premeditation, or (2) perpetrated by a person engaged in the
commission or withdrawing from the scene of a crime other than
a felony, the accused is not entitled to an instruction upon the sub-
ject of manslaughter, where it appears by his own testimony that
the killing was with the admitted design to effect death and was
not in any manner connected with any offense less than a felony.

SAME—DEGREES—PREMEDITATION — EVIDENCE IN MITIGATION — AD-
MISSIBILITY.  In a prosecution for murder in the first degree, evidence
tending to show that the killing was without premeditation is ad-
missible in mitigation and to reduce the crime to murder in the sec-
ond degree.

SAME—PREMEDITATION—PROVOCATION—QUESTION FOR JURY.  Upon
an issue as to premeditation and deliberation, what would be a rea-
sonable provocation is a question for the jury, whenever it can be
said that the alleged provocation would have any reasonable ten-
dency to produce sudden and uncontrollable anger and heat of blood
in an ordinary man.

SAME—PREMEDITATION—REASONABLE COOLING TIME—QUESTION FOR
JURY.  Upon an issue as to premeditation and deliberation, what
would be a reasonable cooling time is a question for the jury, ex-
cept where it can be said that, giving the evidence every reasonable
inference that can be drawn from it favorable to the defendant, the
minds of reasonable men could not differ in the conclusion that a
reasonable time had elapsed.

SAME—PREMEDITATION—SUDDEN ANGER—WHAT CONSTITUTES—EVI-
DENCE—SUFFICIENCY—QUESTION FOR COURT.  Upon an issue as to
premeditation, the court must say, as a matter of law, that a cumula-
tive result of repeated reminders of a single act of provocation oc-
curring weeks before, had no tendency to prove sudden anger in
mitigation, and such evidence was accordingly inadmissible to re-
duce the offense to second degree murder, where it was sought to be
shown by defendant's testimony that he was subjected by the de-

[1]Reported in 153 Pac. 9.

ceased to the outrage of an unmentionable crime, and left uncon-
scious, on the evening of April 19th; that, meeting the deceased the
next day, he upbraided him for the action, but condoned the offense,
requesting the deceased not to mention it to any one; that thereafter
the deceased circulated the story, and the accused was continuously
ridiculed by his countrymen, until it preyed upon his mind and he
became sick and afflicted with severe headaches, and that this culmi-
nated on May 6th in such ridicule that, in his weakened condition,
he lost control of his reason and became so enraged that he rushed
home, secured a revolver with the design of avenging himself, and
shot the deceased while he was asleep in bed.

SAME—MITIGATION — PREMEDITATION — MENTAL IRRESPONSIBILITY.
The fact that such evidence is more compatible with mental irre-
sponsibility amounting to temporary insanity, has no bearing on the
question of mitigation on account of sudden anger and heat of
blood, where the defense of insanity was not pleaded as required by
Rem. & Bal. Code, § 2174, but was expressly disclaimed.

Appeal from a judgment of the superior court for Clarke
county, Back, J., entered July 6, 1914, upon a trial and con-
viction of murder in the first degree. Affirmed.

*Arthur Langguth* and *James O. Blair,* for appellant.

*L. M. Burnett,* for respondent.

ELLIS, J.—The defendant was tried upon an information
charging him with murder in the first degree. The jury re-
turned a verdict of guilty as charged. The defendant's mo-
tion for a new trial was overruled. Judgment was entered
upon the verdict. The defendant appealed.

On May 7, 1914, and for a long time prior thereto, the
appellant and one Dionisios Grounas, known also as Dan
George, both Greeks, had been employed with a number of
their countrymen in a paper mill located at Camas, Clarke
county, Washington. The defendant and George had at one
time lived in the same house, but prior to the date of the
killing, the appellant had moved away and was, on the 6th
day of May, 1914, living in a house about a quarter of a
mile or, as he testified, six or seven blocks from the house
where George lived. At that time the appellant was employed
on the evening shift, which began work at four o'clock in the

afternoon and ceased at midnight. George was employed on a different shift, and on the evening of May 6th, went to bed early, apparently remaining there until the time of the shooting. The appellant did not go to work at four o'clock as usual on that afternoon because, as he testified, he was suffering from a severe headache which lasted all day, the cause of which he was not permitted to relate. He detailed his movements, stating that he visited a pool room, played a little at billiards, made several visits to a coffee house in Camas, played a game of cards with the baker, went to the river intending to commit suicide, but abandoned that idea, visited certain Greeks of his acquaintance and conversed with them for something over an hour, met a man from the old country, took him to his own house and talked with him for some time, and finally, about eleven o'clock at night, again visited the coffee house.

On the 18th day of April, 1914, the day before the Greek easter, the appellant and two other Greeks, in response to an advertisement in a Greek periodical, each ordered from a mail order house in Chicago a box containing a thirty-two calibre revolver and certain other articles, which he testified he ordered because he considered the articles cheap. The appellant's box came about the 30th of April, and on that or the following day he procured ammunition for the revolver from a dealer in Camas. He kept the revolver concealed in his house in a slit in the underside of his mattress. He testified that, on the evening of May 6th, when he made his last visit to the coffee house, there were several of his countrymen there and something occurred, which he was not permitted to detail, which so excited and enraged him as to cause him to form the design of killing Dan George. He testified that he had never at any time thought of killing George until his last visit to the coffee house on the evening of May 6th; that about ten minutes after eleven o'clock he rushed from the coffee house, ran to his own house, made a necessary visit to the toilet, went to his mattress, took out the revolver and

loaded it, went rapidly up the hill to the house where George lived, entered the house and, by the light of a match, found George asleep in his bed, did not awaken him, but immediately shot him through the head, firing five shots, all that he had in the revolver; that he then returned to his own house, removing the empty shells on the way, put the revolver back in the slit in the mattress and went to bed, where he was shortly afterwards arrested.

Counsel for the appellant, in his opening statement, disclaimed any intention of asking an acquittal but started to detail certain circumstances which he expected to prove in mitigation to reduce the offense from murder to manslaughter. On objection by the state, he was not permitted to proceed with this part of the statement. In the progress of the defense, counsel offered to prove by the appellant that, on the 19th day of April, 1914, the Greek easter, the appellant, who was then living in the same house with the deceased, had taken several glasses of beer and, either because of the beer or of some drug therein, had become helpless and almost unconscious, when the deceased, after making many insulting remarks concerning the appellant and his wife, who lived in the old country, finally, while the appellant lay helpless on the floor, committed upon him the unmentionable crime and went away, leaving the appellant in a state of semi-consciousness; that the appellant thereafter moved to another house, and on the next day, meeting George on the street, upbraided him for his action and asked him why he had done it, to which George, in substance laughingly replied, "You're all right, it did not hurt you;" that the appellant then, in order to avoid the disgrace of the matter, asked George to say nothing about it to their countrymen; that thereafter, wherever the appellant went, he would hear remarks and see signs made by his countrymen indicating that George had circulated the story, so that the appellant was continuously ridiculed and subjected to insulting remarks and gestures on the part of his fellow countrymen. That these things so preyed upon

his mind that he became sick and afflicted with severe headaches, and that the headache on May 6th, which was so severe as to prevent his working, was induced by this cause; that, when he entered the coffee house at about eleven o'clock on the evening of May 6th, there were about ten men there, who began making laughing remarks and suggestive gestures which, in the appellant's weakened condition, so excited and enraged him that he lost all control of his reason and rushed from the house with the design of avenging himself by killing George.

The appellant also offered to prove by other witnesses that Dan George had in fact circulated the report of his treatment of the appellant and that, by reason thereof, the insulting remarks, signs and gestures were often made in the appellant's presence. These offers were made in the absence of the jury, and the evidence was by the court excluded. The appellant was asked in the presence of the jury, "Why did you kill Dan George?" The court, evidently understanding that, in answer to this question, he would repeat the story which had been excluded, did not permit him to answer further than to say that he first thought of killing George, "At the moment when I saw those inhuman things at eleven o'clock."

After the foregoing offer of evidence had been refused, and after counsel for the appellant had disclaimed any intention of seeking an acquittal on the ground of insanity or any other ground, he made an offer to show, by the testimony of an alienist, "what a man would do under these circumstances or is likely to do." The court then asked if any question of insanity was raised, and counsel answered, "No," further stating, in effect, that the alienist would not say that the man was insane either at the time of the killing or at the time of the trial or ever had been, but he would say, from his examination of the appellant, that the appellant acted under an uncontrollable impulse, produced by bringing back to his mind the outrage with such vividness and force that it was

as real to him on the night of the killing as at the time when the outrage was committed, and even more so because of his weakened condition. This evidence was also excluded.

The court instructed the jury as to the necessary elements of murder in the first and second degrees, but refused to instruct as to manslaughter. There are many assignments of error, but they are all directed to the exclusion of the offered evidence, which, it is claimed, should have been admitted in mitigation of the offense from murder to manslaughter, and to the refusal of the court to instruct as to manslaughter upon such evidence. The solution of these questions will sufficiently dispose of all the errors assigned.

The criminal code of 1909, which is now in force, defines and classifies homicide, reading from Rem. & Bal. Code, § 2390, as follows:

"Homicide is the killing of a human being by the act, procurement or omission of another and is either (1) murder, (2) manslaughter, (3) excusable homicide, or (4) justifiable homicide."

Murder in the first degree, reading from § 2392, is defined as:

"The killing of a human being, unless it is excusable or justifiable, is murder in the first degree when committed either:

"(1)   With a premeditated design to effect the death of the person killed, or of another; or

"(2)   By an act imminently dangerous to others and evincing a depraved mind, regardless of human life, without a premeditated design to effect the death of any individual; or

"(3)   Without a design to effect death, by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of, a robbery, rape, burglary, larceny, or arson in the first degree; or

"(4)   By maliciously interfering or tampering with or obstructing any switch, frog, rail, roadbed, sleeper, viaduct, bridge, trestle, culvert, embankment, structure or appliance

pertaining to or connected with any railway, or any engine, motor or car of such railway . . ."

Murder in the second degree is defined by § 2393 as:

"The killing of a human being, unless it is excusable or justifiable, is murder in the second degree when—

"(1)    Committed with a design to effect the death of the person killed or of another, but without premeditation; or

"(2)    When perpetrated by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of, a felony other than those enumerated in section 2392 . . ."

Section 2394 classifies participating in a duel resulting in a killing as murder in the second degree. Section 2395 defines manslaughter as follows:

"In any case other than those specified in sections 2392, 2393 and 2394, homicide, not being excusable or justifiable, is manslaughter. . . ."

Then follow several sections, 2396 to 2403, inclusive, declaring certain acts resulting in death to be manslaughter. These are all cases resting upon some peculiar ground of public policy. Section 2404, 2405 and 2406 define excusable and justifiable homicide. We shall not consider these, as it is not claimed that the act of the appellant here was either excusable or justifiable.

A reading of the foregoing sections of the code makes it manifest that the general definition of manslaughter contained in § 2395, by a process of elimination through the definitions of first and second degree murder, includes the killing of a human being without justification or excuse when: (1) Committed *without* design to effect death and *without* premeditation, or (2) Perpetrated by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of a crime *other than a felony.* This, aside from specific instances of manslaughter enumerated in sections 2396 to 2403, inclusive, is the full residuum of inexcusable and unjustifiable homicide, after eliminating

those homicides specifically defined as murder in the first and second degrees. It is obvious that, under the admitted facts of this case as testified to by the appellant himself, his crime could not, by any construction of the evidence, be reduced to the degree of manslaughter. The killing was with the admitted design to effect death, and was not in any manner connected with the commission of any other crime less than a felony. Clearly, therefore, the evidence which was offered and excluded was not admissible for the purpose of proving, because under other admitted facts it did not tend to prove, manslaughter.

But it does not follow that the evidence offered was properly excluded. Obviously, if the evidence tended to mitigate the crime from murder in the first degree to murder in the second degree, it should have been admitted. If it had that tendency it would have been admissible at common law as tending to reduce the crime from murder to manslaughter, but, as we have seen, under our present statute, a killing with intent to produce death, but without premeditation, is murder in the second degree. If, therefore, the offered evidence had any tendency to negative premeditation and deliberation, which are essentials of murder in the first degree, it should have been admitted.

The appellant contends that what would be such reasonable provocation as to be competent evidence in mitigation, and what would be a reasonable cooling time after such provocation, are always questions for the jury.

The doctrine of mitigation is briefly this: That if the act of killing, though intentional, be committed under the influence of sudden intense anger or heat of blood obscuring the reason, produced by an adequate or reasonable provocation, and before sufficient time has elapsed for the blood to cool and reason to reassert itself, so that the killing is the result of temporary excitement rather than of wickedness of heart or innate recklessness of disposition, then the law, recognizing the standard of human conduct as that of the

ordinary or average man, regards the offense so committed as of less heinous character than premeditated or deliberate murder. Measured, as it must be, by the conduct of the average man, what constitutes adequate cause is incapable of exact definition.

"*The Doctrine*—under this head, appearing as it does in the books in illustrations rather than in rules, hardly admits of reduction to rule. Not attempting an impossible exactness, we may deem it in a general way to be that the law accepts human nature as God has made it, or as it manifests itself in the ordinary man, and every sort of conduct in others which commonly does in fact so excite the passions of the mass of men as practically to enthrall their reason, the law holds to be adequate cause." 2 Bishop, Criminal Law (8th ed.), § 701.

By this it is not meant that the reason should be so entirely obscured as to destroy intelligent volition, otherwise there could never be any mitigation short of actual insanity. This is pointed out by Mr. Justice Christiancy in a leading case, *Maher v. People*, 10 Mich. 212, 219, 81 Am. Dec. 781, as follows:

"It will not do to hold that reason should be entirely dethroned, or overpowered by passion so as to destroy intelligent volition: *State v. Hill*, 1 Dev. & Bat., 491; *Haile v. State*, 1 Swan, 248; *Young v. State*, 11 Humph. 200. Such a degree of mental disturbance would be equivalent to utter insanity, and, if the result of adequate provocation, would render the perpetrator morally innocent. But the law regards manslaughter as a high grade of offense; as a felony. On principle, therefore, the extent to which the passions are required to be aroused and reason obscured must be considerably short of this, and never beyond that degree within which ordinary men have the power, and are, therefore, morally as well as legally bound to restrain their passions. It is only on the idea of a violation of this clear duty, that the act can be held criminal."

See, also, *Seals v. State*, 62 Tenn. 459; *Johnson v. State*, 129 Wis. 146, 108 N. W. 55, 5 L. R. A. (N. S.) 809.

Though many courts have held to the contrary, we are convinced that, for the very reason that it cannot be measured by any Procrustean standard or reduced to any fixed rule, the question of adequate or reasonable *cause* is essentially a question of fact to be submitted to the jury under proper instructions, whenever it can be said that the alleged provocation would have any reasonable tendency to produce sudden and uncontrollable anger and heat of blood in the ordinary man. The question of such reasonable *tendency* is of necessity a question for the court arising upon the admission of testimony. Substituting the words "murder in the second degree" for "manslaughter," we are satisfied to adopt the general views expressed in *Maher v. People, supra,* as a correct statement of the law.

"It is, doubtless, in one sense, the province of the court to define what, in law, will constitute a reasonable or adequate provocation, but not, I think, in ordinary cases, to determine whether the provocation proved in the particular case is sufficient or reasonable. This is essentially a question of fact, and to be decided with reference to the peculiar facts of each particular case. As a general rule, the court, after informing the jury to what extent the passions must be aroused and reason obscured to render the homicide manslaughter, should inform them that the provocation must be one, the *tendency* of which would be to produce such a degree of excitement and disturbance in the minds of ordinary men; and if they should find such provocation from the facts proved, and should further find that it did produce that effect in the particular instance, and that the homicide was the result of such provocation, it would give it the character of manslaughter. Besides the consideration that the question is essentially one of fact, jurors, from the mode of their selection, coming from the various classes and occupations of society, and conversant with the practical affairs of life, are, in my opinion, much better qualified to judge of the sufficiency and tendency of a given provocation, and much more likely to fix, with some degree of accuracy, the standard of what constitutes the average of ordinary human nature, than the judge whose habits and course of life give him much less

experience of the workings of passion in the actual conflicts of life.

"The judge, it is true, must, to some extent, assume to decide upon the sufficiency of the alleged provocation, when the question arises upon the admission of testimony; and when it is so clear as to admit of no reasonable doubt upon any theory, that the alleged provocation could not have had any tendency to produce such state of mind, in ordinary men, he may properly exclude the evidence; but, if the alleged provocation be such as to admit of any reasonable doubt, whether it might not have had such tendency, it is much safer, I think, and more in accordance with principle, to let the evidence go to the jury under the proper instructions. As already intimated, the question of the reasonableness or adequacy of the provocation must depend upon the facts of each particular case. That can, with no propriety, be called a rule (or a question) of law which must vary with, and depend upon the almost infinite variety of facts presented by the various cases as they arise. See Stark on Ev., Amer. Ed., 1860, pp. 676 to 680. The law can not with justice assume, by the light of past decisions, to catalogue all the various facts and combinations of facts which shall be held to constitute reasonable or adequate provocation. Scarcely two past cases can be found which are identical in all their circumstances; and there is no reason to hope for greater uniformity in future. Provocations will be given without reference to any previous model, and the passions they excite will not consult the precedents."

See, also, *State v. Hoyt,* 13 Minn. 132; *State v. Grugin,* 147 Mo. 39, 47 S. W. 1058, 71 Am. St. 553, 42 L. R. A. 774; *State v. Beatty,* 51 W. Va. 232, 41 S. E. 434; *Stott v. Commonwealth,* 17 Ky. Law 308, 29 S. W. 141; 2 Thompson, Trials, § 2183.

What is a reasonable cooling time is also, we think, generally a question for the jury. While there are many authorities which hold that it is always a question of law for the court, that view seems to us clearly invasive of the constitutional guaranty of jury trial. All courts agree that the time necessary for cooling is a reasonable time. The question of reasonable time is always a conclusion to be drawn from all

of the facts and circumstances of the particular case.    This is true where reasonable time is the ultimate issue even in civil cases when what is a reasonable time is not defined by statute. *Merritt v. Meisenheimer*, 84 Wash. 174, 146 Pac. 370.

In *State v. Yarborough*, 39 Kan. 581, 18 Pac. 474, Chief Justice Horton, after pointing out that some authorities hold that the question of cooling time is a question of law only, says:

"The great weight of authority, however, is that the question as to whether a reasonable time had elapsed for the passions to cool and reason to resume its control, is one of fact for the jury. . . .

"It must be borne in mind that the criminal law holds sane men responsible for the ordinary exercise of their reason; and that, although indulging to a certain extent mere infirmities of human nature, nevertheless it requires the exercise of control or mastery over one's passion.    Hence it is said that 'the time in which an ordinary man, under or in like circumstances, would have cooled, is a reasonable time.' "

In this view, we concur.    As stated in 2 Bishop's New Criminal Law (8th ed.), § 712:

"We have no rule for determining how much time is necessary for cooling; in the nature of things, it must depend much on what is special to the particular case.    Commonly the time in which an ordinary man under like circumstances would cool is deemed reasonable."

We apprehend that the true rule is precisely the same as that in other cases where reasonableness of human conduct is necessarily measured by the conduct of the ordinary or average man in like situation, so frequently announced and applied in cases where the ultimate question is one of negligence.    It is only where it can be said that, giving to the evidence every reasonable inference that can be drawn from it favorable to the defendant, the minds of reasonable men could not differ in the conclusion that a reasonable cooling time had elapsed, that the question is one for the court. Wanting this inevitable conclusion, both from the evidence

and inference therefrom, the question is always one for the jury upon proper instructions. As said again by Justice Christiancy in *Maher v. People, supra*:

"In such case, where the law has defined what shall be reasonable time, the question of such reasonable time, the facts being found by the jury, is one of law for the court; but in all other cases it is a question of fact for the jury; and the court can not take it from the jury by assuming to decide it as a question of law, without confounding the respective provinces of the court and jury: Stark, Ev. Ed. of 1860, pp. 768, 769, 774, 775. In *Rex. v. Howard*, 6 C. & P. 157, and *Rex. v. Lynch*, 5 C. & P. 324, this question of reasonable cooling time was expressly held to be a question of fact for the jury. And see Whart. Cr. L. 4th ed., § 990, and cases cited. I am aware there are many cases in which it has been held a question of law; but I can see no principle on which such a rule can rest. The court should, I think, define to the jury the principles upon which the question is to be decided, and leave them to determine whether the time was reasonable under all the circumstances of the particular case. I do not mean to say that the time may not be so great as to enable the court to determine that it is sufficient for the passion to have cooled, or so to instruct the jury, without error; but the case should be very clear."

Measured by these principles, in which we have adopted the most liberal views expressed by any court, did the court err in refusing to admit the offered evidence of provocation? For the purpose of this discussion, we must, of course, assume that the offered evidence was true. There can be no doubt that the original outrage committed by the deceased would have been a sufficient provocation to take the case to the jury if the appellant, immediately upon realizing its perpetration, had sought out and slain the deceased. There can be little doubt that had the appellant slain the deceased when, on meeting him the next day, the deceased impudently treated the outrage as inconsequential, the question of provocation would have been for the jury. No court would be warranted in saying that such callous conduct, while the original wrong

was but a day old, would have no reasonable tendency to
produce immediate, uncontrollable anger destroying the ca-
pacity for cool reflection in the average man.   In such a case,
evidence of both the previous conduct and the insolent be-
havior of deceased on the subsequent meeting would have been
admissible.   *Biggs v. State*, 29 Ga. 723, 76 Am. Dec. 630;
*Miles v. State*, 18 Tex. App. 156; *People v. Barberi*, 149
N. Y. 256, 43 N. E. 635, 52 Am. St. 717.

The appellant, however, did neither of these.   On the meet-
ing the next day, notwithstanding the insolence of the de-
ceased, he admittedly condoned the offense, requesting that
deceased preserve silence.   It may even be conceded that had
the appellant met the deceased immediately after first dis-
covering, from words and gestures of others, that deceased
had circulated the story of the outrage and then, smarting
under this added injury, had killed him, evidence of the whole
transaction should have been submitted to the jury to de-
termine the adequacy of the provocation.   We have, however,
been cited to no case, independent of a governing statute, in
which it has been held that the immediate provocation, when
referable for its provocative force to some antecedent outrage
known to the accused from the beginning, was held sufficient
to take the case to the jury, when not the act of or partici-
pated in by the deceased.   At least one court has asserted
that provocative words or acts, to have a reasonable tend-
ency to produce a mitigating degree of anger and excite-
ment in the ordinary man, must be the words or acts of the
victim at the time and place of the killing.   *State v. Lewis*,
14 Mo. App. 191, 196.   We are not prepared to go so far,
since it would seem but natural that, on first seeing the ges-
tures and hearing the words of others indicating that the
story had been circulated, the appellant would as certainly
know that the deceased was responsible for its circulation as
if he had been present and participating in the demonstra-
tions, and that such knowledge would be as suddenly exas-
perating, when at *first acquired*, the one way as the other.

But even this assumption does not meet the case in hand.
According to the offered evidence, the appellant let these
things pass repeatedly for many days without molesting the
deceased even to the extent of a remonstrance. The offered
evidence makes it clear that the appellant knew and appre-
ciated for days before the killing the full meaning of the
words, signs and vulgar gestures of his countrymen which,
as the offer shows, he had encountered from day to day for
about three weeks following the original outrage, wherever
he went. The final demonstration in the coffee house was
nothing new. It was exactly what the appellant, from his
experience for the prior three weeks, must have anticipated.
To say that it alone tended to create the sudden passion and
heat of blood essential to mitigation is to ignore the admitted
fact that the same thing had created no such condition on its
repeated occurrence during the prior three weeks. To say
that these repeated demonstrations, coupled with the original
outrage, *culminated* in a sudden passion and heat of blood
when he encountered the same character of demonstration in
the coffee house on the night of the killing is to say that
sudden passion and heat of blood, in the mitigative sense,
may be a cumulative result of repeated reminders of a single
act of provocation occurring weeks before, and this, whether
that provocation be regarded as the original outrage or the
spreading of the story among appellant's associates, both of
which he knew and fully realized for three weeks before the
fatal night. This theory of the cumulative effect of re-
minders of former wrongs, not of new acts of provocation by
the deceased, is contrary to the idea of sudden anger as
understood in the doctrine of mitigation. In the nature of
the thing, *sudden* anger cannot be cumulative. A provoca-
tion which does not cause instant resentment, but which is
only resented after being thought upon and brooded over,
is not a provocation sufficient in law to reduce intentional
killing from murder to manslaughter, or under our statute

to second degree murder, which includes every inexcusable, unjustifiable, unpremeditated, intentional killing.

"Provocation which would not naturally cause instant resentment, however, but which would have to be thought and brooded over after it is given, in order to produce rage or anger, is not, in contemplation of law, a provocation sufficient to reduce an intentional killing from murder to manslaughter." Wharton, Homicide (3d ed.), p. 273, § 172.

See, also, *State v. Walker*, 50 La. Ann. 420, 23 South. 967. The evidence offered had no tendency to prove sudden anger and resentment. On the contrary, it did tend to prove brooding thought, resulting in the design to kill. It was, therefore, properly excluded. *State v. Wilson*, 38 Conn. 126.

The decisions mainly relied upon by the appellant do not sustain his contention. In *People v. Barberi, supra,* the defendant, a woman, killed the man who had betrayed her by fraudulent means under a promise of marriage, and who, after repetitions of the promise and failures to fulfill it, finally flatly refused with insulting words, whereupon the woman immediately cut his throat. The court held that this final refusal and the brutal words uttered by the deceased, taken in connection with his prior wrongs to her, should have been submitted to the jury as tending to mitigate the crime from murder in the first degree to a lower grade of homicide. Obviously, the final provocation was the act and words of the deceased himself which, taking character from the original wrong, were such as reasonably tending to produce instant and ungovernable resentment. The court said:

"Deliberation and premeditation imply the capacity at the time to think and reflect, sufficient volition to make a choice, and by the use of these powers, to refrain from doing a wrongful act. The defendant had been deceived, betrayed, disgraced and ruined, but it is not certain that she formed the definite intention to use the weapon until she heard the final refusal of the deceased to marry her. She followed the

deceased into the saloon to make a final appeal to him to extricate her from the position in which he had placed her, and it is evident that she had not yet lost all hope of succeeding either by persuasion or threats. It was only when this hope was gone, after his final refusal, accompanied as it was by insulting and brutal imputations, that might well have aroused the most violent passions, that she struck the fatal blow. If, at that moment, in consequence of what he said to her and the final culmination of the alleged wrongs of which she conceived herself to have been the victim, she became incapable of reasoning or of deliberating, the act, we think, would not constitute murder in the first degree."

This case goes much further than any other case cited or any which we have found, but is still clearly distinguished from the case here. The final act of provocation was sufficient in itself to constitute mitigation and proceeded directly from the deceased. It was a new provocation for the first time committed, not a mere reminder by the words or acts of others of an old provocation long condoned.

The decision in *Willis v. State* (Tex. Cr.), 75 S. W. 790, rests largely upon a statute of Texas relating to killing as the result of insults toward female relatives. It announces no rule of law applicable to the facts here.

A review of the other decisions cited would be profitless. None of them deals with facts in any sense similar to those before us.

The cumulative effect of the original outrage and the humiliation suffered by the appellant by reason of being subjected to continual reminders of it, though wholly inadmissible as tending to prove sudden anger in mitigation, might, nevertheless, have tended to produce a weakened mental and physical state amounting to temporary insanity or moral irresponsibility at the time of the commission of the homicide. The appellant, however, not only failed to plead insanity as required by our statute, Rem. & Bal. Code, § 2174, but expressly disclaimed that defense. His position is clearly summed up in his reply brief as follows:

"We do not claim that defendant was insane. In fact our disclaimer is spread upon the record. What we do claim, however, is, that as a result of the constant recurrence of the signs, gestures and conversations indicating the act of sodomy, during the three weeks intervening between the alleged act of sodomy and the killing, the defendant was in such a state of health, both physically and mentally, that he was incapable of reasoning or of deliberating and that therefore, the act would not constitute murder in the first or second degree, but manslaughter."

The condition so described and the reasons given for it are obviously wholly incompatible with sudden anger and heat of blood, as understood in the law of mitigation. It is much more compatible with mental irresponsibility amounting to temporary insanity. As a defense to crime, we know of no degrees of insanity. So far as we know, it has never been recognized as an element of mitigation, but only as a complete defense when established.

We are constrained to hold that, upon the offer of evidence for the purpose of mitigation, the court must, as a preliminary question, decide, as a matter of law, whether the offered evidence has any tendency to prove mitigating circumstances. If it has any such tendency it must be admitted, and the questions of sufficient provocation and cooling time are then solely for the jury. If it has no such tendency, there is no error in its rejection. Upon all authority, we are convinced that the evidence here had no such tendency. It was properly rejected.

The judgment is affirmed.

Morris, C. J., Holcomb, Mount, Parker, and Main, JJ., concur.