## ALF ORANGE v. THE STATE.

### No. 2939. Decided November 23, 1904.

**Murder—Evidence—Absence of Express Malice—Murder in the Second Degree.**

Where defendant testified that deceased and defendant's wife had been seen by him in the act of having carnal intercourse on the morning of the homicide, but that defendant thereafter had met deceased several times without calling him to account, and later in the day again met deceased and killed him, while not legal cause to reduce the offense to manslaughter, might have reduced the homicide to murder in the second degree, and testimony that the reputation of deceased for virtue and chastity in the community in which he lived was bad was admissible to strengthen the testimony of appellant to show his state of mind and the absence of express malice.

Appeal from the District Court of Rusk. Tried below before Hon. Richard B. Levy.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*J. W. McDavid* and *R. T. Brown,* for appellant.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at imprisonment for life; hence this appeal. The State's theory was that the homicide was committed by appellant on deceased, who was his father-in-law, because deceased had ordered him to remove from his house and take up his abode elsewhere—appellant at the time living with his wife at his father-in-law's house. The State's testimony tends to show that sometime antedating the homicide, appellant and his father-in-law did not get along harmoniously. On the morning of the homicide appellant's wife and her mother were discussing some lace. The mother proposed to buy some lace and put on the dress of appellant's wife. Appellant's wife protested that she would get the money from her husband and buy the lace, that he had money in the bank. At this juncture appellant, who was in the room, interfered, and told them that he had heard enough of that sort of thing, and they were all a bad lot, or words to that effect; and became abusive. Deceased, who came in about that time interfered, and told him he must move out, he could not stay there any longer. It seems appellant left the house shortly afterwards, and deceased and his wife put his things out in the yard. Deceased subsequently went to the little town of Kilgore, and about noon returned and was at the house of one Leach, who owned the premises on which deceased lived. Appellant had previously been to the house and told Leach, that he suspected deceased of having intercourse with his wife, who was the daughter of deceased. Leach endeavored to disabuse his mind of this idea. Appel-

lant then suggested to Leach to see Thompson and get him to agree for him to remain at his home, which Leach promised to do.   About this time deceased came up and Leach broached the subject to him, to get him to agree, that appellant might continue to live with him.   This deceased would not agree to, but said he must leave.   Deceased started off; appellant followed him and accosted him about continuing to live with him; told him he had treated him badly, and deceased declined to permit him to remain longer at his home; telling him to get his things and move out.   Whereupon appellant drew his pistol and shot and killed deceased. Appellant's theory was that deceased (who was the father of his wife) was cohabiting with his wife, and he himself testified that he caught deceased in bed with his wife on that very morning; that he was willing to move from the premises of deceased, but his wife would not go.   He further claimed that he killed deceased because deceased, when he approached him at Leach's demanded that he leave his place, and repeated to him his prostitution of his wife, and that deceased at this juncture put himself in the attitude as if to draw a weapon, and he killed him. It is also in evidence that appellant had rented another place and procured a party to move him.   They went to the house to move appellant's plunder, but appellant's wife would not move; and this was abandoned. It is also shown that appellant borrowed a pistol that morning after the first trouble between him and deceased.   On this state of facts, the court charged murder in the first and second degree, manslaughter and self-defense: the manslaughter being predicated on insulting conduct to appellant's wife by deceased.

Appellant offered to prove by several witnesses that the reputation of Johnson Thompson (deceased) for virtue and chastity in the community where he lived up to the time of his death was very bad.   He proposed to introduce this evidence for the purpose of showing that Johnson Thompson (deceased) was a vile and unchaste man, and would likely be guilty of having carnal intercourse with his daughter.   This evidence, on objection by the State, was excluded; and appellant reserved his bill of exceptions.   A reference to the statement of facts discloses the fact that appellant alone testified to the infidelity of his wife and her carnal intercourse with deceased; that he witnessed the same on that very morning.   Of course, if that was true, he would have been justified, under our statute, in slaying deceased at that time; or even if he had heard of such a thing and believed it, and subsequently on the first meeting with deceased, slew him, he would only be guilty of manslaughter.   He neither slew deceased on that occasion, nor could the jury find that he killed him on the first meeting, because the evidence in that regard showed that he not only witnessed the affair, but that he met deceased once or twice between that event and the homicide.   But would that transaction, occurring in the morning, serve to inflame appellant's mind, so that the subsequent killing on the same day might constitute the offense murder in the second degree?   Undoubtedly a transaction of that sort was calculated to engender and excite passion, and our law so recognizes it.   If the

jury should believe that the transaction in question really happened and that appellant formed the intent to kill, in a mind excited on that account, they would be authorized to find him guilty of murder in the second degree. They evidently did not believe the transaction occurred as testified to by appellant. If the testimony excluded would have served the purpose to corroborate and reinforce appellant's testimony, it would certainly be pertinent and relevant to an issue in the case. The authorities, as we understand, hold that evidence of the character of deceased upon any relevant issue, as either shedding light upon the acts and conduct of deceased, or as showing with what intent appellant was actuated, is admissible in evidence. See Williams v. State, 14 Texas Crim. App., 102; Branch v. State, 15 Texas Crim. App., 96; Martin v. State, 6 Texas Ct. Rep., 267. Here, as an important factor in graduating the degree of murder of which appellant might be found guilty, was the state of mind in which his intent to slay was formed. If his mind was cool and deliberate when he formed the intent, he would be guilty of murder upon express malice; if his mind was excited by passion and in a disturbed state when the intent was formed and carried out, he would be guilty of murder upon implied malice. So it was material evidence on his behalf, and the court in admitting it so treated it, to show the act of carnal intercourse between deceased and appellant's wife on the morning of the homicide. Any testimony that was pertinent to establish the truth of this issue, it occurs to us, was admissible; and accordingly the testimony relating to deceased's character in that respect was relevant and pertinent. If deceased was a man of chaste moral habits, he would not likely commit such an outrage. If, on the other hand, he was a man of unchaste and lewd character, he was such a one as would more likely commit such a flagrant offense, as carnal intercourse with his own daughter. In this respect, the jury had a right to all testimony that would shed any light on his character, as being a chaste moral man or otherwise. This character of testimony would serve to support and corroborate his testimony; and in our opinion the court erred in rejecting the evidence offered on this subject. Jones v. State, 38 Texas Crim. Rep., 87. The jury, in the absence of this testimony may not have believed appellant's account of the transaction. With this testimony they may have believed his statement and so have found him guilty of murder in the second degree, instead of murder in the first degree with a life sentence: at any rate, he was entitled to the benefit of this evidence. We would not be understood as holding that this evidence would necessarily change the result, but it was pertinent testimony on a material issue in the case, and appellant should not have been deprived of it.

The writer believes that the testimony offered by appellant as shown by his third bill of exceptions, was admissible. A majority of the court, however, believe the testimony was self-serving and inadmissible.

It is not necessary to discuss other assignments of error in the case. For the errors indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*