STATE v. LOVELACE.

(Filed 10 December, 1919.)

1. **Homicide—Murder—First Degree— Instructions— Evidence— Premeditation.**

Evidence in extenuation offered by the prisoner upon trial for a homicide, cannot be considered on appeal from the refusal of the court to charge the jury that the evidence would not warrant a conviction of murder in the first degree, but only the single question as to whether there is evidence of premeditation and deliberation, if the evidence is otherwise sufficient.

2. **Homicide—Murder—First Degree—Evidence—Husband and Wife—Parental Influence.**

Where there is evidence tending to show that the deceased missed his wife from his home after returning from his work, and traced her to her parents' home; that he had previously complained of her parents' interference between his wife and himself, and threatened to kill them if they continued therein; that after he had failed to induce his wife to talk privately with him in his effort to get her to return to his home, he went away, and as the parents and their daughter were sitting upon the porch, he came back again, and taking hold of her, he shot her father twice, without offer of violence on his part, inflicting the mortal wound, and threatened death to the others if they did not comply with his wish: *Held*, sufficient upon the question of deliberation and premeditation of the plain-

tiff to be determined by the jury upon the issue as to murder in the first degree.

**3. Evidence—Interested Witnesses—Credibility—Instructions.**

Where witnesses interested in the result of the trial have testified, a charge of the judge respecting their testimony, to give it the same weight as other testimony, though they were interested, if the jury were satisfied they had told the truth, is correct.

**4. Homicide—Murder—Defense—Instructions—Appeal and Error—Harmless Error.**

Where the defendant contends upon his trial for homicide that the fatal shot was fired accidentally, a charge that the defendant did not contend that he acted in self-defense is consistent with his position, and it is *Held,* that the defense would be considered to be what the evidence made it, and not what the defendant called it, and if the defendant received the benefit thereof it would not be prejudicial to him.

**5. Appeal and Error—Instructions—Evidence—Error Cured—Homicide.**

Upon the trial for a homicide, evidence of bad feeling between the prisoner and his wife's family if erroneously admitted, the error cured by the judge afterwards telling the jury that they must not consider it in rendering their verdict.

**6. Courts— Evidence— Withdrawn— Appeal and Error— Error Cured— Instructions.**

Upon the trial of the prisoner for the murder of his father-in-law, with testimony that the wife's parents had prejudiced her against her husband, testimony as to the cordial relationship between the prisoner and his wife is incompetent, the question being as to the feeling of the prisoner towards the deceased, and the admission of this evidence in defendant's behalf would tend to prejudice the jury against the deceased, and was properly excluded.

APPEAL by defendant from *Finley, J.,* at the April Term, 1919, of RUTHERFORD.

The defendant was convicted of murder in the first degree, and from the sentence of death upon such conviction appealed.

The deceased, H. E. Edwards, lived on his farm, five or six miles from Rutherford, and about two and one-half miles from Gilkey, a station. The defendant, Dennis Lovelace, who was a flagman, having a regular run on the railroad, had married a daughter of Edwards some nine years before, and had by her four children. The couple lived at Shelby. The wife, Iva Lovelace, with the children, had gone to Union Mills to visit defendant's father, G. W. Lovelace.  On Saturday, 31 August, while on his run between Blacksburg and Marion, and when his train had stopped at Union Mills, the defendant was handed a note from his wife, by his father.  In this note she informed him that she was at Union Mills, and asked him to come for her and the children the next day, Sunday, and they would go back home together. The defendant could not go on

Sunday, and the wife, instead of going home to Shelby, took the children and went to Gilkey, and out to her father's (the deceased's) home that afternoon. The defendant went to Shelby Sunday afternoon, and not finding his wife and children at home on Monday morning, 2 September, went to Union Mills. Not finding them there, he came back that afternoon to Rutherfordton, where he left the train, hired an auto and went out to the Edward's home, about five miles off. This was about 5 :50 p. m.

Lorena Edwards, wife of the deceased, gives this account of the events of that afternoon:

"Iva came to our house on Sunday evening, and this homicide occurred on Monday evening. My husband had been sick all summer and was a small man, something like five feet high and weighed one hundred and fifteen pounds, and wore No. 4 shoe. It was about six o'clock when Dennis came, and Mr. Edwards was in the field where he was having some work done; the boys were there in the field pulling fodder, and he with them; and Dennis came and I went out on the porch and met him, and he told me he wanted to see Iva; I told him I did not want her to see him; he kept begging to talk to her, and I called her and told her he wanted to speak to her. I don't remember whether it was before Mr. Edwards came up to the house or not; don't remember whether Iva was at the door before he came or not, but she came to the door and talked to him, and he kept begging her to have a private chat with her, and she told him she didn't want to; she told him she didn't love him, and wasn't going to live with him. She just told him that she didn't love him, and wasn't going to live with him; said 'We can't agree; and I am just not going with you.' I don't know that he asked her to go then, but he did keep asking her; didn't ask any pointed question; just pleaded for her to have a private chat with him, and she told him she wouldn't talk with him privately; she wasn't going to live with him, because he had mistreated her and she didn't want to live with him. Mr. Edwards came up and he commenced talking to him, and Mr. Edwards told him that I had been sick in bed and he wasn't mad, and said, 'I don't want to have any fuss here at all; just want you to leave and go off and not bother us'; and he said he wasn't going to have any fuss; didn't want to fuss with him; said 'If Iva can't live with me, that's all right; I'll leave, go off somewhere and stay'; and Mr. Edwards mentioned to him that he had been living in Shelby, and that they had some hogs and chickens, and all their things, and nobody to take care of them, and said, 'What are you going to do about it?' and he said, 'Bring it up here'; he said, 'You go and get it; do what you please with it; I don't want it.' Mr. Edwards went with him to the car and they were friendly, and he got in the car, and Mr. Edwards stood there by the car when the car went off, and seemed to be as friendly and on as good terms as ever. After the

car left, Mr. Edwards and myself walked around; had some turnip seed sowed that month, and we looked at the turnip patch; and when we come back Iva was sitting in a rocker on the front porch, and Florence and Ruth were sitting on the porch seat on the end of the porch, and Mr. Edwards went over and sat down by Iva on the edge of the porch and leaned back against the column of the porch, the middle column of the porch on the south side of the steps. Coming from the church our home faces in the direction of the church, and a person coming down the road from the church would come in at the front door. I was sitting on the north side of the porch, and we were sitting there and talking, and all at once, at the south end of the house—I was looking toward Iva—I saw Dennis come right around the end of the house; he came up the back way at the kitchen, right around the back end of the house, and Mr. Edwards saw him; I guess we all saw him about the same time. Mr. Edwards said, 'You've decided to come back, have you?' and he said yes, he wanted to come and tell his babies goodbye, and he walked up and seemed like he stooped over like he was going to kiss the babies; and Iva sat on this side and Mr. Edwards was sitting over here (indicating), and when he stooped to kiss the babies he put his hand on Iva's right arm on the arm of the chair, his left hand on her right arm, he standing in front of her. Mr. Edwards was sitting on Iva's right, leaning against the column of the porch, with his feet on the porch, and his hands on his knees, about a foot or two from her, and the baby was on this side. Dennis pulled her, I know, because she held to the arm of the chair and he pulled her so that he pulled her out in the yard, and the chair turned over, and when he did that Mr. Edwards put his hand on his arm and said, 'Dennis, you mustn't do that,' and he said, 'G— damn you, what have you got to do with it?' and shot him. I don't know whether he got the pistol in his coat pocket or his pants pocket, but he got it out with his right hand; his left hand had hold of Iva. My husband was standing straight up and he. shot him in the mouth. He was not doing anything, because he didn't have time to do anything; he started off, and I think he was just dying as he started away from him, and as he started away he shot him in the back. Mr. Edwards' arms were up (indicating), and his head was to one side, and he started around the house to the back porch, the way Dennis came; Dennis was close to him when he shot first, and I don't know that he was any further away when he shot the second time than when first shot was fired; he turned around and he shot him in the right shoulder the second time; I saw he was going to fall when Dennis shot him; I started to jump off the porch to go to him, and Dennis said, 'Don't you come here! I'll blow your brains out if you step off the porch!' Said 'Damn you; I'll blow your brains out!' He was still holding my daughter at the time; she pulled like she was trying

to get loose, and he cursed her; said 'Damn you; if you don't want a dose of the same medicine you had better be quiet!' Mr. Edwards went around the house; when he shot him he was turning around, and when he threatened to kill me I went through the house, and Mr. Edwards fell just as I got to the back, close to the back steps; he had gotten around; it seemed he tried to put his foot on the bottom to come in, and fell right above the steps on the ground. He was never able to speak; I don't know that he breathed at all; his pulse was beating, and when I raised him up and asked him to speak to me, he looked up at me and just made a fuss in his throat; his tongue was torn up, he couldn't speak, but looked at me as much as to say, 'I'm dying.' "

There was other evidence corroborating this witness.

The defendant offered evidence tending to prove that he went back to the home of his father-in-law to induce his wife and children to return to their home, and if not, to tell them goodbye; that he had no purpose to kill the deceased, and that he was assaulted by the deceased, and took out his pistol to deter him, and that it was fired accidentally and inflicted the mortal wound in this way.

The defendant introduced two witnesses by whom he proposed to show that the relation between him and his wife was cordial. This evidence was excluded, and the prisoner excepted.

The State was permitted to show that it was the general reputation, by one J. D. Morris, that the defendant was disagreeable with his own family, including his wife. This evidence was excepted to by the prisoner.

At the close of the testimony of the witness, J. D. Morris, the court took recess, and upon reconvening, the court called the stenographer and had her read, in the presence of the jury, the testimony of J. D. Morris on cross-examination, to the effect that there had been rumors that the defendant was disagreeable with his family, his father and mother, and his wife as well; and further, that the witness had heard that he had run his father and mother from home. The stenographer read all the evidence to which exceptions Nos. 3 to 6, inclusive, on cross-examination of witness Morris relate.

The court then stated to the jury: "This evidence on cross-examination of J. D. Morris that was objected to by defendant and admitted by the court is withdrawn from your consideration. After looking into the matter I am satisfied that it is incompetent, and it should not have been presented to you, and you will not consider it in making up your verdict. You have heard the evidence just read as to the general reputation of the defendant for doing certain acts, for mistreating his wife, and running his father and mother away from home. You need not consider that in making up your verdict."

To the action of the court in having the stenographer read the said testimony to the jury the defendant excepts (but this exception was not taken at the trial).

At the conclusion of the evidence the prisoner requested the court, in writing, to instruct the jury that the evidence did not warrant a conviction of the prisoner of murder in the first degree, which was refused, and the defendant excepted.

His Honor instructed the jury, among other things, as follows:

"You are the sole judges of the testimony, and you are also the sole judges as to how much force you shall give any witness's testimony that comes before you. You can take into consideration the demeanor of the witness on the stand. You can take into consideration such impression as they make on you as to whether they told you the truth or have not told the truth. You can also consider as to whether or not their interest in the result of your verdict has swayed them in telling the truth. In this case it is well enough to charge you that the law looks with some suspicion upon the testimony of interested witnesses, but, notwithstanding that fact, if you are satisfied that the defendant or any other witness has told the truth about all or any part of this testimony, why you can give their testimony as much weight as any other witness, in the event you are satisfied they have told the truth."

The prisoner excepted to the last two sentences in this charge.

His Honor also said, in stating the contentions of the prisoner: "It is not contended by the prisoner that he killed the deceased in self-defense," to which the defendant excepted.

*Attorney-General Manning* and *Assistant Attorney-General Nash* for the State.

*Pless & Winborne, W. C. McRorie, O. Max Gardner,* and *W. A. Self* for defendant.

ALLEN, J. The exception chiefly relied on by the prisoner is to the refusal to instruct the jury that the evidence would not warrant a conviction of murder in the first degree, and in dealing with this exception we cannot consider evidence in extenuation or explanation offered by the prisoner, but are confined to the single question as to whether there is evidence of premeditation and deliberation.

In *S. v. McCormac,* 116 N. C., 1036, the Court says: "While premeditation and deliberation are not to be inferred as a matter of course from the want either of legal provocation or of proof of the use of provoking language, yet all such circumstances may be considered by the jury in determining whether the testimony is inconsistent with any other hypothesis than that the prisoner acted upon a deliberately formed pur-

pose. *S. v. Fuller,* 114 N. C., 885. Kerr (in his work on Homicide, sec. 72) says: 'The question whether there has been deliberation is not ordinarily capable of actual proof, but must be determined by the jury from the circumstances. It has been said that an act is done with deliberation, however long or short a time intervenes after the intent is formed and before it is executed, if the offender has an opportunity to recollect the offense.' The test is involved in the question whether the accused acted under the influence of ungovernable passion, or whether there was evidence of the exercise of reason and judgment. The conduct of the accused just before or immediately after the killing would tend at least to show the state of mind at the moment of inflicting the fatal wound. In passing upon the question whether the facts in a given case are sufficient to show beyond a reasonable doubt that the killing was done with deliberation and premeditation, while sudden passion aroused by provocation that would neither excuse nor mitigate to manslaughter the killing with a deadly weapon, is sufficient, if the homicide is committed under its immediate influences, yet the want of provocation, the preparation of a weapon, proof that there was no quarreling just before the killing, may be considered by the jury, with other circumstances, in determining whether the act shall be attributed to sudden impulse or premeditated design." *S. v. Daniels,* 164 N. C., 469.

Applying this principle, we not only find the circumstances pointed out in the *McCormac case* as evidence of premeditation and deliberation, but also other corroborative circumstances.

According to the evidence for the State, the prisoner has prepared a weapon, there was no quarreling, and the killing was without provocation.

In addition, the prisoner admitted while testifying in his own behalf that he had not had much trouble with his wife, "except what the old folks caused"; one Wood testified that he saw the prisoner a week or two before the homicide, and he seemed to be in trouble, and upon inquiry he said if his father-in-law didn't quit bothering with his family affairs he was going to have to go up and kill him."

Flynn, who carried the prisoner to the home of his father-in-law on the evening of the homicide, testified, "When we started back I said, 'Did you marry one of Mr. Edwards' daughters?' and he said yes, and called her name, and I said, 'What's your trouble?' and he said his wife went to see his father, I believe, on a visit, and went down to Mr. Edwards, and got down there and then wouldn't go back home, and he said, 'Them damned old sons of bitches was the cause of it all.'" After he had inflicted the mortal wound he said, "I've been wanting to get you a long time," and his threats and conduct immediately following the shooting.

Much of this evidence for the State is contradicted, and other parts explained or discredited, but these were matters for the jury, and under all the authorities the evidence was sufficient to justify submitting to the jury the charge of murder in the first degree.

The charge requiring the jury to consider the interest of the defendant and other witnesses, but if satisfied they had told the truth they could give their evidence as much weight as the evidence of other witnesses is in accordance with our precedents and not prejudicial to the prisoner. *S. v. Lance,* 166 N. C., 411.

His Honor was stating the position of the prisoner accurately when he said that the defendant did not contend that he killed the deceased in self-defense, because the whole of his evidence tended to prove that he did not intend to kill the deceased at all, and that the pistol fired accidentally, but, however this may be, it makes no difference what the defense of the defendant was called if he had the full benefit of it before the jury, and this was accorded to him.

The full charge on this phase of the case is as follows:

"It is not contended by the prisoner that he killed the deceased in self-defense, but it is contended that the deceased had a brick, and that the prisoner was not in the wrong when the deceased had the brick in his hand, and that he drew his pistol to avoid an apparent assault from the deceased with the brick, and that thereafter the deceased and the wife of the prisoner and the prisoner got into a struggle over the pistol, and that the pistol accidentally fired, and that the killing was therefore unintentional and accidental, and the court charges you that though you should find from the evidence beyond a reasonable doubt that the deceased came to his death as the result of a shot from a pistol in the hands of the defendant, yet if you find from the evidence that the defendant, at the time he took the pistol from his pocket, believed, and had reasonable grounds to believe, that the deceased had a deadly weapon in his hand, and apprehended and had reasonable grounds to apprehend that unless he used the pistol or made a demonstration of a purpose to use it he would suffer death or great bodily harm at the hands of the deceased, and, thereafter, in a struggle which ensued, the pistol was discharged without any intention on the part of the defendant to discharge the weapon, then the court charges you that if the defendant has satisfied you that the killing took place in this way, that it is not a felonious homicide, and you will return a verdict of not guilty."

' This states the contention of the prisoner as he testified.

It is unnecessary to consider the competency of the evidence of the witness Morris as to the disagreeable relation existing between the prisoner and his wife, because if there was error on its reception it was cured by its withdrawal and by the explicit instruction not to consider it.

49—178

"If juries should be deemed incompetent to comprehend, or unable to obey, so plain a direction as that a paper read in their hearing is 'not to be considered as evidence, and that it had only been admitted to make the defendant's reply to it (when read to him) intelligible'—if so low an estimate should be placed upon juries, then the jury system is a failure, and should have no place in our jurisprudence." *S. v. Crane,* 110 N. C., 535.

The evidence offered to prove a cordial relation between the defendant and his wife was properly excluded.

It could not be received on the question of the defendant's character, because not confined to general character (*S. v. Ussery,* 118 N. C., 1181), and as a circumstance it was not relevant to any issue before the jury. The material inquiry was as to the feeling of the prisoner towards the deceased, which the rejected evidence would have had the tendency to intensify in the estimation of the jury, as resentment would naturally be greater against one who had caused the separation from an affectionate wife.

We have examined the record with care and find no error, but we cannot but be impressed by the evidence, which shows very clearly that this tragedy, which has wrecked two homes, could have been easily averted if the deceased and his wife had given a little encouragement to their daughter to return to her home and her duties.

No error.