## STATE v. FLORY
(No. 1538; April 3, 1929; 276 Pac. 458)

186

*Metz, Sackett & Metz,* of Sheridan, for appellant.

*W. O. Wilson,* Attorney General, *J. A. Greenwood,* Deputy Attorney General, and *R. J. Jackson,* Assistant Attorney General, for respondent; *C. A. Kutcher,* of counsel.

*Metz, Sackett & Metz,* in reply.

*C. A. Kutcher,* for respondent.

BLUME, Chief Justice.

The defendant was convicted of murder in the second degree for killing E. T. Ostrum on January 16, 1928, and he appeals.

The deceased, aged between 65 to 70 years, was the father of Daisy Flory, the wife of defendant, who is about 21 years of age, and who married defendant in 1923. The

mother and father of Daisy were, it seems, divorced, for a number of years prior to the homicide in question in this case. The father apparently was not well acquainted with his daughter and paid little attention to her, although he sent her some small presents when her two children, aged three years and one year, respectively, were born. At the time of the homicide and for some time prior thereto, the deceased lived on a farm in Campbell County, Wyoming, the defendant on a farm in Montana, the distance, by road, between the two places being about fifty miles. The deceased was engaged in farming and in performing common labor. The defendant was a ''dry-farmer'' in the summer and a trapper in the winter. Deceased wrote to his daughter in the summer of 1927, wanting to visit her, and she and her husband invited him to come. He arrived on the day after Thanksgiving, during the absence of the defendant, who came home on November 30th. The visit between the deceased and defendant was pleasant, and it was agreed, in fact, upon suggestion of the deceased, that the latter might, somewhat later, move over to defendant's place, build himself a house and in the meantime occupy the ''bunkhouse'' on defendant's place. He was invited to continue his visit at that time until after Christmas, which he agreed to do. Defendant left home, to go trapping, about the middle of December, and returned, as was expected, on the afternoon of December 23rd. He claims that during this time the deceased made indecent proposals to Daisy Flory, defendant's wife, and raped her and committed incest upon her on the morning of December 23. According to the testimony, defendant was not told thereof until later, although she immediately indicated to him that she did not want her father to stay longer and did not want him to move as had been planned. Deceased left on December 26, first to visit at another place and then to go home. On January 3rd, 1928, defendant had occasion to

go to Ostrum's place to get some poison for coyotes and to tell him not to move. During this time the deceased mentioned to defendant that he had discussed with Daisy the subject of not having any more children, and he gave defendant a package containing a silk sponge and three rubbers, used for prevention of conception, stating that while at Sheridan a few days previously, he had bought nine of them. Defendant had never discussed the subject with his wife and when he arrived home and showed her the package, she was perturbed, exclaimed "O God," and from that time to the morning of January 15th, she gradually told him of the details of the indecent advances and rape above mentioned, telling the final scenes on the morning of the date last mentioned, and that deceased had said: "Don't be foolish 'and say anything about this." The defendant thereupon took his gun, as he was accustomed to do when going on trips, with the intention, as he testified, of going to deceased's home and getting an explanation of the latter's conduct. He stopped overnight at the house of Mr. Hudsonpillar, and the next morning went to the house of deceased, arriving there about 11 o'clock in the forenoon, finding the deceased at home. The house is nearly 24 feet square, entered by a door in the south into a large room occupying the whole of the south 13 feet. The north side of the house is divided between a kitchen, about 9x10 feet in area, in the northwest corner, and a store-room in the northeast corner, each being connected with a large room by a door. No one else was there, and the only living witness to the tragedy is the defendant himself. He testified at length and his testimony, condensed, is about as follows:

"I took the gun along in because I knew he was stouter than I, and I knew he could handle me. I had no intentions when I went in of killing the man at all. He says 'Hello' to me, and I walked towards him, and I said 'What made you rape Daisy.' And he came right straight

towards me. I looked at both hands, but he didn't have anything in them, and he says to me 'Let's talk it over,' and I says to him, 'Don't come any closer,' and he turned around and walked back, and I walked after him—to see what he was going to do, and when he got to the stove (in the northwest corner of the kitchen) he says 'Let's talk it over.' He was facing me in a stooped-over position and I says to him 'Charley, do you know you just about ruined my home?' And he says 'I will keep the girl,' and when he said that, I says 'You are a pretty son-of-a-bitch to keep your daughter.' I was thinking of some of the things he had done, and was pretty nervous, and that man he just sprang after me, and when he did I jerked the rifle back, and just then I heard the report of the gun, and I saw him fall, and I turned around and went out. At no time did he deny he didn't rape his daughter. When I jerked the rifle back, I have no recollection of pulling the trigger with my finger. I didn't intend to shoot him when I jerked the rifle back, and it surprised me, and I turned around and went out. I had fear when he came at me. He had the meanest look in his face of any man I ever saw, and I knew he could handle me, if he got hold of me. I was giddy when I went out.''

On cross-examination he testified, among other things:

''I was mad on my way over there and when I got there, but not any madder than any one else under the circumstances. I didn't tell Hudsonpillar I was going to Ostrum's. I didn't want to talk to him about it. I can't say that I was mad when I got to Hudsonpillar's. The gun was cocked when I took it out of the scabbard; I didn't examine it, but usually carry it with the safety on. I didn't rap when I went in. As I was opening the door, on the south, he showed up in the kitchen. I went right in; had the gun in the right hand. I walked towards the deceased; deceased was in the kitchen; I walked close

to the kitchen door, keeping my eyes on deceased; I point-
ed the gun at him, when he came toward me the first
time, and shouted at him 'Don't come any closer,' and he
went back into the kitchen. I went next to the door. He
had nothing in his hands, but when he sprang for me, I
don't think so. I saw nothing in them. When he said 'I
can keep the girl' it made me mad. I didn't take my eyes
off Ostrum. I must have taken the safety off the gun
when he rushed at me the first time. It looked like to me
he was rushing for the rifle, and when he rushed towards
me, I jerked the rifle, and that was when the shot was
fired. I didn't intend to shoot him. The gun went off ac-
cidentally. I didn't intend to shoot him, and it got me so
I couldn't stay there and look at him, I was intending to
get away from him as he came toward me. I jerked the
gun back and went backwards, and the gun went off. I
was standing right in the door (leading to the kitchen).
I knew he was dead the way he fell. I later gave myself
up at Sheridan.''

On re-examination he testified that he wept twice while
going to Ostrum's.

The body of deceased was later found in the kitchen,
lying from southwest to the northwest, the head close to the
door which leads out of the kitchen on the north, his feet
at least three feet away from the west of the kitchen door
where the defendant had stood when he shot the de-
ceased. Spots of blood were found further west, and
within a little over a foot from the kitchen stove. The
shot which killed the deceased entered his arm and then
the body, and death was probably instantaneous. Some
other facts will be mentioned later.

1. Defendant complains because a witness was allowed
to testify to foot steps seen two days after the homicide
on the east side of the house and leading from there to the
front of the house on the south, without showing by meas-

urement or otherwise that they were the footsteps of the defendant. The testimony was evidently produced to show that the defendant looked in the window on the east instead of going directly into the house, as he himself subsequently testified. The house of deceased was isolated and in a sparsely settled community where but a few people went, and in view of the admission of the defendant that he was there on January 16th, the testimony might have had some tendency to show that the tracks were his. Cases are cited in which such testimony, without further identification, was condemned. But these are mostly cases in which the defendant denied the killing, and in which the character of such testimony became important. The only case cited that is in point is State v. Davis, 55 S. C. 339, 33 S. E. 449, which holds that in view of the fact that defendant pleaded self-defense, the admission of the testimony, if error, was without prejudice. We think that to be true in the case at bar.

2. Defendant complains of instructions given and refused on self-defense. There is some doubt in our minds as to whether this defense was in the case at all or not, for the reason that defendant testified that he did not intend to shoot deceased, but that the shooting was accidental and a surprise to him. State v. Lovelace, 178 N. C. 762, 101 S. E. 380; Maiden v. Com., 203 Ky. 446, 262 S. W. 588; State v. Reed, 117 Mo. 604, 23 S. W. 886; State v. Clinton, 278 Mo. 344, 213 S. W. 841. He further stated that when the deceased came toward him, it seemed that he was "rushing for the rifle." That was probably true, but whether the deduction is at all warranted which counsel attempt to draw therefrom, namely, that the defendant was in danger or could reasonably believe himself in danger of his life is another question. This testimony would rather seem to show a dramatic situation produced by defendant; would seem to indicate that the spectre of death, produced by the display of a deadly weapon, was grimly hovering

before the eyes of deceased, and that he, in sheer desperation, sought to prevent what seemed to him a deadly design, by attempting to get hold of the instrumentality by which that design might be carried into effect. That, too, seems to be a sufficient and a reasonable explanation of the terrible "look" of the deceased of which defendant professed himself to be unable to give an adequate description. When grim death stares men in the face, they are not likely to think of inflicting harm on another, but are likely to follow the natural impulse to preserve their own lives. However that may be, there are cases in which both accident and self-defense have been admitted as defenses. State v. Doris, 51 Ore. 136, 94 Pac. 44, 50. 16 L. R. A. (N. S.) 660. See also State v. Klute, 160 Iowa 170, 140 N. W. 864. And we shall assume that self-defense, to some extent at least, was properly in this case.

The appellant complains of instructions 18, 19 and 21 given by the court, which are as follows:

18. "You are instructed that it is a familiar and well-established doctrine of the law that, in order to entitle a person to the benefit of the plea of self-defense against a charge of homicide, he must, out of regard for human life, have employed all reasonable means within his power, consistent with his safety, to avoid the necessity of taking life. The right to kill does not arise until such a course reasonably appears necessary. Self-defense implies that the shot which killed was fired for self-protection, rather than for retaliation or punishment, or for revenge. And in this case even if you should believe from the evidence that deceased commenced the encounter in question and was the first to offer violence, but further believe from the evidence, beyond a reasonable doubt, that the defendant could, by making a reasonable effort, have avoided or safely withdrawn from it, and thereby avoided further trouble, and that he made no effort to do so, but voluntarily entered into and continued the encounter and shot and killed the deceased, then I charge you that the killing of deceased could not be excused or justified on the ground of self-defense, and you would have no right to acquit the defendant on that ground."

19. "You are instructed that the law does not permit a person to voluntarily seek or invite a combat in order that he may have a pretext to take the life of his assailant. The right of self-defense does not imply the right to attack, and it will not avail in any case where the accused voluntarily and of his own free will enters into and continues it. And in this case if you believe from the evidence, beyond a reasonable doubt, that the defendant voluntarily and of his own free will entered into and continued the encounter in question, until he fatally shot the deceased, then you would have no right to acquit the defendant on the ground of self-defense."

21. "You are instructed that, under the plea of self-defense, the defendant would be justified in using only sufficient force, as reasonably appeared necessary under all the circumstances, to save his life or to protect himself from great bodily harm. He had no right to go further and to use a deadly weapon in a deadly manner, if wholly unnecessary."

Counsel for appellant offered certain instructions which the court refused to give. Instruction A 2 was to the effect that if defendant went to Ostrum's house in order to arrest him or obtain an admission from him as to the crime upon defendant's wife, then he was lawfully on Ostrum's premises. Instruction C was to the effect that if defendant was attacked by Ostrum and defendant had reasonable ground to believe that he was in imminent danger of losing his life or receiving great bodily injury, then he was not required to retreat, but could stand his ground and if necessary kill the deceased. Instruction L was to the effect that a person without fault and in a place where he had a right to be need not retreat if he is violently assaulted but may stand his ground and repel force with force and, if necessary, kill his opponent. Counsel for the defendant complain of the use of the word "encounter" in the instructions given, and claim that there was only an attack on the part of the deceased, and no encounter. We see no error in the use of the word.

The defendant had a gun pointed at the deceased, which constituted a display of force as much as a blow. The main objection urged, however, is that the court failed to inform the jury that the defendant had the right to stand his ground under the circumstances mentioned in the instructions offered but not given.

Many cases are cited which deal with the right of the defendant to stand his ground. The duty to retreat is considered in notes to 2 L. R. A. (N. S.) 1 and 18 A. L. R. 1279, 45 L. R. A. 687-712, and it would seem that many courts have modified the common law doctrine and hold, as stated in 18 A. L. R. 1291, that "if the person assailed is without fault, and in a place where he had a right to be, and put in reasonably apparent danger of losing his life or receiving great bodily harm, he need not retreat, but may stand his ground, repel force by force, and if, in the reasonable exercise of his right of self defense, he kills his assailant, he is justified." We have not heretofore decided this question. In Palmer v. State, 9 Wyo. 40; 59 Pac. 793, we held that a man need not retreat if assaulted, without fault, in his own home, and this doctrine is held by all the courts. An instruction on the duty of retreat was given in Ross v. State, 8 Wyo. 351, 383, 57 Pac. 924, in which that duty was stated, but the question raised by counsel here was not considered. Nor do we need to decide the controverted point now, for the reason that the testimony in this case does not, we think, make the modified rule applicable herein, but that the case is rather governed by the converse thereof, namely, that a person who provokes or brings on the difficulty in which he kills his assailant, cannot invoke the right of self-defense, unless he in good faith retreats as far as he safely can, making that fact manifest to his adversary. The authorities appear to be absolutely unanimous on this point, although they may not, at times, apply the principle in a uniform manner. 30 C. J. 45, 68; Wharton, Homicide, Sections

299, 318; Note 45, L. R. A. 688; Dec. Digest, "Homicide," Sec. 113. In Banks v. Com., 196 Ky. 639, 245 S. W. 296, the rule is stated thus:

"It is a well-established doctrine that, if one is an aggressor, or provokes a difficulty or affray, he cannot invoke the right of self-defense to justify the killing of his antagonist, unless he first, in good faith, withdraws or attempts to withdraw from the combat, and that, too, in a way that his adversary will see that he intends to withdraw, and he cannot justify the slaying of an adversary because, in the course of a re-encounter, to save his own life or to save himself from great bodily harm it becomes necessary to kill, where he has been at fault in causing the difficulty in which he becomes endangered."

And the reasons for retreat in such case are well stated in Hays v. Territory, (Okla. Sup.) 52 Pac. 952, thus:

"The doctrine of retreat is a part of the law of self-defense. Self-defense is one of the rights which the law of necessity gives to man. It is founded and based on necessity—on the inability of the executive machinery of the law to be always with the citizen to protect him from the aggression of others. A right of such a high character must also, of necessity, be attended with high responsibilities; and that is the obligation on the part of one who exercises the right to be the executioner of his fellow man to see that his own conduct is exemplary. Self-defense is a legal right, not an excuse for a homicide, and it can be exercised only where he who employs it is himself in the right at the time or moment of its use. The aggressor—one who strikes another, and thereby brings on a combat, or one who by the use of vile and opprobrious language almost as surely brings on a combat—is not clothed with the right of self-defense so long as he continues to persist in his own wrongdoing. He must discontinue his own assault, whether by violence or by word, before the law of necessity says that he can strike down his assailant; and whether or not he is required to retreat before resorting to the awful extremity of taking human life, when he is in the right, he certainly must resort to that

simple expedient, if it is consistent with his safety, when he is in the wrong.''

The general principle was recognized by this court in Ross v. State, supra, and Delaney v. State, 14 Wyo. 1, 12, 81 Pac. 792. Not every provocation, of course, will deprive a man of his right of self-defense. It must be one reasonably calculated to lead to an affray, was intended to do so or is the natural consequence of his acts. 13 R. C. L. 833; 30 C. J. 53; Polk v. State, 30 Tex. App. 657; State v. Castello, 62 Iowa 404, 17 N. W. 605. But when a man has himself produced the difficulty, his own wrong is justly imputed to him. It will not in all cases visit the extreme punishment upon him. It will regulate it in accordance with the magnitude of his wrong. So the law of self-defense has been divided into the right of perfect and imperfect self-defense. If the slayer provoked the combat or produced the occasion in order to have a pretext for killing his adversary, or doing him great bodily harm, the killing will be murder, no matter to what extremity he may have been reduced in the combat. But if he provoked the combat, or produced the occasion without any felonious intent, the final killing in self-defense will be manslaughter only. State v. Partlow, 90 Mo. 608, 4 S. W. 14, 59 Am. Rep. 31, and cases cited; Wallace v. United States, 162 U. S. 476, 16 Sup. Ct. 859, 40 L. Ed. 1039; 13 R. C. L. 832, Sec. 136; Wharton, supra, Sections 224, 319; 30 C. J. 52; note 45 L. R. A. 687. And it is said that a perfect right of self-defense can only obtain and avail where the party pleading it acts from necessity, and is wholly free from wrong or blame in occasioning and producing the necessity which requires his action. Wharton, supra, Sections 318, 319; note 45 L. R. A. page 690.

Counsel claim that these principles are not applicable in the case at bar, and that the testimony does not justify the claim that the necessity for killing was brought about by the defendant's fault. They picture the defendant as

engaged in an innocent mission, in a peaceable manner, namely to obtain evidence of a heinous crime. We fear that counsel in their zeal for their client are not looking at the facts aright. It was a fair question for the jury as to whether or not the defendant went to the house of the deceased with a felonious purpose, but there can be but one answer otherwise. It may be conceded that he had a right to interview the deceased in a peaceable manner to get an explanation of his conduct (see 13 R. C. L. 833; 30 C. J. 53); that the mere fact of his going to deceased's house, standing by itself, is not against him; that the mere fact of his taking his gun into the house is not important. But the combination of all the facts makes the case clear. The place where the deceased was killed was his home, his castle, not that of the defendant, and we cannot concede that a stranger has the same right in another man's castle, as the owner thereof. The defendant went in armed. He did not seek information; his first act was an accusation of the deceased of a most infamous crime. He later used most opprobrious epithets in speaking of the deceased, and he held his gun in his hands, pointed at the deceased, telling him to come no further, implying a threat to use the gun. To go into another man's house with a deadly weapon under circumstances of ill-temper and for altercation is in nearly all cases in itself an ominous sign of dangerous trouble ahead, and for us to hold that under the evidence in this case the defendant had a right to stand his ground would be but to indulge and humor the weakness of human nature and invite and encourage murder and disaster. And this we cannot consent to do. We think it clear that the defendant produced the occasion through his fault, that it was his absolute duty to retreat, which he did not do; that there was no room in this case, under the evidence, for the rule that the defendant had the right to stand his ground, and that so far as self defense was concerned, the jury could not in any event properly have convicted the defendant of anything less than man-

slaughter. The case of State v. Ball, 110 Kans. 428, 204 Pac. 701, presents evidence on this point very similar to that in the case at bar, connected with trouble similar to, though not as provocative as that here, the defendant, however, inviting the deceased into his house, while here the trouble was in the home of the decedent. The court said:

"There was no evidence that defendant at any time ceased to be the aggressor; there was no evidence that he was at any time in danger at the hands of his victim; there was nothing in the evidence which could be distorted into a rational theory of self defense to explain or justify the homicide; the defendant's victim was captured, taunted, and slain like a rat in a trap; yet the court very considerately and at length instructed the jury touching the law of self defense."

See also Lemmons v. State, (Okl. Cr. App.) 265 Pac. 652.

Aside from what we have said the first instruction asked was erroneous and misleading. We have been cited to no authority that defendant, a citizen of Montana, had a right to come to this state and arrest the deceased. It was wholly misleading in that it confined the point of the defendant's right to be in the house to his intentions with which he went there, without taking into account his subsequent acts. The second instruction asked left out of account the fact as to defendant being at fault. Further, instruction No. 14 given by the court stated substantially what was asked in the one just mentioned. The third instruction asked was based on the assumption that the defendant was without fault, when the undisputed testimony shows that he was not. While not of importance, in view of our conclusion, we may add at this place, that counsel for defendant claim that a threat was made against defendant by deceased. That is based on the offered testimony that deceased said to defendant's wife: "Don't be foolish and say anything about this," and further on the following offer: that "he placed her in fear, and said other things which she doesn't remember, causing her to fear

that she would be in danger, or her children or her husband.'' The last part is altogether too indefinite. We cannot see how any threat against defendant can be made out of this. If it was a threat at all, it was one against the wife, which could not be made the basis for a claim of necessity of self defense by the defendant. Mahoney v. Pearce, (Wyo.) 265 Pac. 446, 450.

3. The defendant contends that the information given him by his wife as to the rape and incest committed upon her by the decedent so aroused his passions and deprived him of such self-control that his act cannot be held to be murder. The incest and rape, if true, could not justify the killing of the deceased. 30 C. J. 37. But the evidence may be admissible for the purpose of mitigation and to reduce the crime to manslaughter. 30 C. J. 224-225. The state contends that the testimony was not admissible in this case, because ample time—at least a day and probably longer—had elapsed after the defendant had been informed of the acts of decedent; further, that defendant's own testimony shows that when he was at Hudsonpillar's during the evening and night of January 15th, 1928, his blood had cooled and he was no longer perturbed. Counsel for the defendant say that when he, on the morning of January 16th, met the deceased, and the latter did not deny the rape and said that he would keep his daughter, this was heaping insult upon injury and vividly recalled to defendant's mind what had been told him on the previous days. There is other testimony which shows to some extent at least that defendant's mind was perturbed on his way to Ostrum's. We are inclined to agree with defendant's contention. The crime of deceased, if true, was most heinous and was calculated to create a most violent passion in the mind of the defendant, and it is hardly to be expected that it would, as a matter of law, subside within so short a time, especially when, as testified, a situation arose by which past facts were clearly recalled. Courts are not altogether agreed as to whether the ques-

tion of cooling time is one of law or one for the jury. Some hold it to be a question of law and that 24 hours is sufficient for the mind to cool. Territory v. Holliday, 5 Ut. 467, 17 Pac. 118; Brewer v. State, 160 Ala. 66, 49 So. 336; Wickham v. People, 41 Colo. 345, 93 Pac. 478; State v. Merrick, 171 N. C. 788, 88 S. E. 501. We think, however, that the weight of authority is that, in cases like that at bar, the question of cooling time depends on the circumstances and is ordinarily one for the jury. State v. Grugin, 147 Mo. 39, 47 S. W. 1058, 42 L. R. A. 774; State v. Gounagios, 88 Wash. 304, 153 Pac. 9; Haley v. State, 123 Miss. 87, 85 So. 129, 10 A. L. R. 462; McDaniel v. State, 90 Tex. Cr. R. 636, 237 S. W. 297 and cases cited; Ferguson v. State, 49 Ind. 33; Biggs v. State, 29 Ga. 723, 76 Am. Dec. 630; Maher v. People, 10 Mich. 212, 81 Am. Dec. 781; People v. Barberi, 149 N. Y. 256, 43 N. E. 635, 52 Am. St. Rep. 717; State v. Thomas, 169 Ia. 591, 151 N. W. 842. In the last case cited it is said:

"Where the want of provocation is so clear as to admit of no reasonable doubt that the alleged provocation could not have had any tendency to produce such state of mind in ordinary men, the evidence thereof should be excluded; but, if there be a reasonable doubt as to whether the alleged provocation had such tendency, it is the safer rule to let the issue go to the jury under proper instructions. Of course, the reasonableness or adequacy of the provocation must depend on the facts of each particular case. In some cases, the courts declare that only actual personal knowledge of the wife's infidelity will extenuate the crime of killing by husband to manslaughter. See State v. Neville, 51 N. C. 423, supra. But others with better reason hold that information of the recent liaison of the wife with a paramour reaching the husband for the first time may be shown as likely to have thrown him into ungovernable passion. See Maher v. People, 10 Mich. 212, 81 Am. Dec. 781. The circumstances of each case necessarily must determine the admissibility of the evidence as well as its bearing on the different issues presented. Again, it is to be remarked that there is no definite time within which the passions, when aroused by such a wrong, may be said to have so far subsided, and reason to have resumed its

sway to such an extent as that thereafter the killing may be denounced as in vengeance alone. The question is one of reasonable time and dependent on all the facts of the case. While the time may be so long as to exclude all doubt on the subject and exact the exclusion of the evidence insofar as offered in extenuation, more frequently it should be submitted to the jury under proper instructions. Maher v. People, supra.''

4. The court, in fact, permitted the defendant to show that the wife of the defendant told him of the commission of the rape and incest, but excluded all details, and collateral facts tending to show the state of the defendant's mind. In this we think there was error. While no cases discuss the point directly, (see, however, People v. Barberi, supra), courts seem to have admitted the details told a defendant as a matter of course, and the reasons for that are plain. In the first place, a bare statement of the ultimate fact might give the jury the impression that it is fabricated, while a detailed statement might add credibility to the witness. Again, the pertinent inquiry is as to what was the condition of the defendant's mind as the result of what has been told him. In order to determine that, the jury must, mentally, be placed as near as possible in the position of the defendant, in order to be able to judge properly. Details of an atrocious character would be more apt to affect the mind of the defendant, just as details are more apt to affect the mind of anyone else. A Hickman recently committed a murder of an atrocious character in California. The public mind was inflamed. Why? Because of the character of the murder—the details made known. Had it not been for that, the murder would probably have been almost unnoticed, except in the immediate locality where it was committed. It is true, of course, as argued, that the details might prejudice and inflame the minds of the jury; if so, the same details would be apt to inflame the mind of the defendant, and that is the very point that was to be determined by the jury. The matter of importance, in this connection, of course, is as to what

was told the defendant, not whether the facts which were told were true. The Texas courts seem to hold that evidence of the truth would be corroborative. Orange v. State, 47 Tex. Cr. R. 337, 83 S. W. 385; Bereal v. State, 88 Tex. Cr. R. 138, 225 S. W. 252; see State v. Foster, 150 La. 971, 91 So. 411. See also People v. Barberi, 149 N. Y. 256, 43 N. E. 635, 52 Am. St. Rep. 717, which case, however, is distinguishable from this case, because in that case the defendant herself experienced the insulting conduct of deceased. The courts in general which have discussed the point seem to have taken an opposite view. Check v. State, 35 Ind. 492; Combs v. State, 75 Ind. 215; Bryan v. Com., 131 Va. 709, 109 S. E. 477; People v. Hurtado, 63 Cal. 288; People v. Webster, 139 N. Y. 73, 34 N. E. 730; State v. Murray, 83 Kans. 148, 110 Pac. 103; State v. Albanes, 109 Me. 199, 83 Atl. 550; Riggs v. Com., 103 Ky. 610, 45 S. W. 866; Shipp v. Com., 124 Ky. 643, 99 S. W. 945, 10 L. R. A. (N. S.) 335; Nettle's case, 58 Ala. 268; Lee v. State, 16 Ala. App. 53, 75 So. 282; State v. Stewart, 274 Mo. 649, 204 S. W. 10; State v. Young, 314 Mo. 612, 286 S. W. 29. It may, however, be that in order to properly present to the jury just what was told the defendant, and to fully get before them the effect on defendant's mind, the court should not be too strict, when the woman raped or attacked is examined, as to the method in which she tells her story and related the facts to the defendant.

So, too, testimony that is clearly corroborative and has a tendency to cause the defendant in such a case to believe what has been told him as to such rape, incest or attack should be allowed to go to the jury. In this case, for instance, the defendant offered to prove by the brother of the wife of defendant that before the homicide she told defendant in his presence that she did not want her father to stay longer and that he acted too much like an animal. So, too, he offered testimony that the deceased asked Arthur Flory—subsequently and before the homicide communicated to defendant—how he could be around "a nice young

woman'' like Daisy ''without tackling her.'' Such testimony as this clearly had a tendency to cause the defendant to believe what his wife had told him. Courts are not agreed as to the admissibility of evidence as to the character or reputation for chastity of a deceased in such case. In State v. Murray, 83 Kans. 148, 110 Pac. 103, testimony of salacious conduct of the defendant, though not the details thereof, was admitted. Some courts have permitted testimony as to the reputation for chastity. Jones v. State, 38 Tex. Cr. R. 87, 40 S. W. 807, 41 S. W. 638, 70 A. S. R. 719. Other courts seem to take an opposite view. See Jamison v. State, 7 Ala. App. 3, 60 So. 944; Kelley v. State, 146 Ark. 509, 226 S. W. 137; Hall v. State, 89 Ark. 569, 117 S. W. 753. The point, of course, is as to whether or not unchastity in general would tend to cause the defendant to believe that deceased would commit rape, and not alone that, but rape upon his own daughter, and how far, from a practical standpoint, it would be advisable to admit such evidence. We are not agreed on the point at this time, and in view of our ultimate conclusion herein, we deem it unnecessary to decide it, or to decide other controverted points of admissibility of testimony in connection with this subject. Sufficient has been said thereon to guide the trial court, should another trial be had in the case.

5. Counsel for defendant claim that evidence as to the truth of the rape on defendant's wife should have been admitted under the plea of self-defense, just as uncommunicated threats are admitted in such case, because such evidence tends to show who was the aggressor at the time of the homicide. Some cases have admitted such evidence for that purpose. Blackerby v. Com., 200 Ky. 832, 255 S. W. 824, mentioned with approval in the subsequent case of Lee v. Com., 203 Ky. 63, 261 S. W. 842. The courts of Alabama and Iowa, too, have so held. Gafford v. State, 122 Ala. 54, 25 So. 10; State v. Thomas, 169 Iowa 591, 151 N. W. 842. Other courts apparently have held the contrary.

People v. Webster, 139 N. Y. 73, 34 N. E. 730; State v. Stewart, 274 Mo. 649, 204 S. W. 10; Combs v. State, 75 Ind. 215. Perhaps the true rule should depend on the circumstances. In Warren v. State, 197 Ala. 313, 72 So. 624, 633, in which self-defense was apparently set up, the evidence sustaining it was weak, and the court held that it was proper to decline to allow proof by the defendant of the details of an assault on defendant's niece. That is about what was done in the case at bar. The Alabama court in the case last cited further points out that testimony should be admitted more liberally, when, as in that state—which is not true here, except in cases of first degree murder—the jury fixes the penalty. In Blackerby v. Com. supra, and State v. Thomas, supra, jealousy and desire of the deceased for a woman appeared. In such cases it may well be held that such feelings furnish a motive for attack on the part of a deceased just as much as jealousy may be shown as a motive on the part of a slayer. Without analyzing the cases on this subject further, suffice it to say that the cases holding such evidence admissible under the plea of self-defense present facts materially different from those in the case at bar, and we cannot see how any prejudicial error on this point was committed in the case at bar. We cannot conceive how the truth of the assault on defendant's wife could possibly have supported or strengthened the plea of self-defense herein. There is doubt, as already pointed out, whether the evidence presents any question of self-defense at all; if it does, the testimony as to the truth of the assault on Mrs. Flory could not help it out, for it is clear that the difficulty was brought on by the defendant, and he was substantially the aggressor. If the evidence mentioned would have had any bearing at all, which we doubt, it would have been to show that when deceased went toward the defendant the second time, the latter was actually in apparent danger of life or limb, which, if true, would reduce the degree of crime to manslaughter, but no further.

6. The court gave its instruction No. 33, reading as follows:

"It is the duty of each juryman, while the jury are deliberating upon their verdict, to give careful consideration to the views his fellow jurymen may have to present upon the testimony in the case. He should not shut his ears and stubbornly stand upon the position he first takes, regardless of what may be said by the other jurymen; it should be the object of all of you to arrive at a common conclusion, and to that end you should deliberate together with calmness. It is your duty to agree upon a verdict, if that is possible."

The defendant asked the court to give the following instruction numbered A, reading as follows:

"You are instructed that if any one of the jury after having considered all of the evidence in this case and after having consulted and conferred with his fellow jurymen should entertain a reasonable doubt of the defendant's guilt then the jury cannot find the defendant guilty."

These two instructions were given in Nicholson v. State, 18 Wyo. 298, 106 Pac. 929, and the court held that the defendant was not prejudiced thereby. In Harris v. State, 23 Wyo. 487, 513, 153 Pac. 881, 889, Ann. Cas. 1917a, 1201, the first of these instructions was given, but not the second, which seems not to have been asked for, and the court held that no error was committed, but stated:

"We think it would be .better in such an instruction, to avoid possible misunderstanding, to connect with what is there said a statement to the effect that the verdict should finally be the verdict of each individual juror or express the opinion of each."

The trial court did not follow the suggestion of this court for reasons that do not appear in the record, and the defendant claims that in view of the fact that instruction No. 33 was given, it was error to refuse to also give the instruction asked, though there would have been no error,

if none had been asked on the subject. Counsel, however, too, failed to follow the suggestion made in Harris v. State, supra, and asked for instruction A. Instructions resembling it have several times been held to be misleading. Thus of a similar instruction the court in Ayers v. State, 62 Fla. 14, 57 So. 349, the court said:

"It was well calculated to mislead the jury into the idea that it was their duty to acquit the accused if any one or more of them entertained a reasonable doubt as to his guilt, whether the rest of them were free of any such doubt or not."

In Alabama the court seems to have drawn some fine distinctions on this point and the holdings do not seem to be altogether harmonious. In Burkett v. State, 215 Ala. 453, 111 So. 34, it was held that an instruction to the effect that if a single juror has reasonable doubt of guilt there can be no conviction, is properly rejected for the reason that it "seems to mean more than that reasonable doubt of one juror precludes conviction." In Turner v. State, 160 Ala. 40, 49 So. 828, the following instruction was asked:

"If any member of the jury has a reasonable doubt of the guilt of the defendant from the evidence, the jury will give the benefit of the doubt to the defendant, and not return a verdict of guilty."

The court held it to be "misleading in its tendency, in that the jury might have inferred, from the hypothesis therein stated, that the charge required or authorized a verdict of not guilty, and this, too, on a reasonable doubt entertained by only one juror." In Troup v. State, 160 Ala. 125, 49 So. 332, an instruction was asked to the effect that "before you can convict each one of you must believe beyond all reasonable doubt that accused committed the act charged, and if either member of the jury have a reasonable doubt thereof, he must so find." The Supreme Court, holding that the instruction was properly refused, said:

"Charge 2 does more than assert that unanimity among jurors as to belief of guilt beyond a reasonable doubt is necessary to a conviction. It asserts the duty of a single juror who doubts to find in accordance with his doubt, and thus in effect makes each the keeper of the consciences of his fellows."

A number of cases cited from some of the states, including California and Kansas, have held an instruction similar in effect to the instruction asked to be proper and necessary when asked. Many other courts, on the contrary, hold such instruction to be improper or unnecessary. State v. Young, 105 Mo. 634, 16 S. W. 408; State v. Penny, 113 Iowa 695, 84 N. W. 509; Ayers v. State, 62 Fla. 14, 57 So. 349; Davis v. State, 63 O. S. 173, 57 N. E. 1099; State v. Peare, 113 Or. 441, 233 Pac. 256; Seay v. Cone, 135 Va. 737, 115 S. E. 574; Scott v. Com., 143 Va. 510, 129 S. E. 360; State v. Ely, 114 Wash. 185, 194 Pac. 988; State v. Godwin, 131 Wash. 591, 230 Pac. 831; Tucker v. State, 17 Okl. Cr. 580, 191 Pac. 201; State v. Boyles, 34 Ida. 283, 200 Pac. 125; Com. v. Hassen, 235 Mass. 26, 126 N. E. 287; People v. Lee, 237 Ill. 272, 86 N. E. 573; People v. Lardner, 296 Ill. 190, 129 N. E. 697. In State v. Young, supra, the court said:

"We think it is an unnecessary reflection upon jurors to say that they are so ignorant that they do not understand that each juror must be convinced of defendant's guilt. So universally is this conceded, that in the whole range of criminal trials in this state, no one has ever before thought it necessary to embody the idea in an instruction. And while no harm could possibly come from giving it, we do not think its refusal could possibly have prejudiced the defendant's case. The defendant could have polled the jury and ascertained exactly how each one stood on this question. The cause cannot be reversed for this action of the court in refusing it."

In Ayers v. State, supra, the court, in addition to what has already been quoted, further said:

"Of course a verdict must' be concurred in by the unanimous vote of the entire jury, and no honest juror will concur in a verdict of conviction, if he entertains a reasonable doubt of the defendant's guilt; but the defendant has an ample remedy for the ascertainment of the fact as to whether any member of the jury failed to agree to the verdict returned by the polling of the jury, without the giving of the charge confining the question of reasonable doubt to any individual member or members of the jury."

So in Davis v. State, the court said that if the defendant was in doubt as to whether the verdict was unanimous, he could have polled the jury. And in Seay v. Com., supra, the court said:

"The instruction might probably, with propriety, have been given, but it embodies principles so well understood by every one and so fully covered by the oath of each juror that its refusal cannot be deemed error."

In State v. Peare, the court said of a similar instruction:

"While this instruction is approved by a few authorities, * * * it is against the decided weight of authority."

In State v. Boyles, supra, the court said:

"While the court, in its discretion, in some cases might properly give such instruction, its refusal to do so, is not error. * * * A juror must realize that his oath as a juror binds him individually, and that instructions addressed to the jury as a whole are addressed to him individually. State v. Howell, 26 Mont. 3, 66 Pac. 291. Instructions calculated to place especial emphasis upon the duty of each individual as a juror to be convinced in his own mind before he agrees to a verdict are unnecessary and generally not to be commended."

It does not appear in these cases whether an instruction similar to instruction 33 given in the case at bar was asked or given. Notwithstanding that, we cannot overlook the force of the reasoning contained therein. Even California

has held a number of times that refusal to give an instruction similar to that here asked could not be cause of reversal. People v. Walton, 53 Cal. App. 35, 199 Pac. 824 and cases cited. So it was held in State v. Tolliver, 109 Kans. 660, 202 Pac. 99, that such instruction is not always necessary, and that whether it should be given or not depends on the facts in each case. In the case at bar, the jury were instructed that the state was required to prove every material allegation, including the several degrees charged, to the satisfaction of the jury beyond a reasonable doubt, and the necessity of proof beyond a reasonable doubt was also contained in instructions 9, 15, 18 and 19. So instruction No. 35 had a direct tendency to call the attention of the jury to the very point now urged. That instruction is as follows:

"When you retire to deliberate it is your duty to appoint one of your members as foreman, and *after you have all arrived at a verdict,* the foreman shall sign the verdict in writing and return the same to the court."

In view of the foregoing authorities, and in view of the evidence and the facts in this case, we are convinced that we are not called upon to reverse this case on account of the assigned error now in question, although under a different state of facts, we might conclude otherwise, if the proper instruction is asked.

We have a case here, accordingly, in which we find that there is no error in the case, except as to the refusal to admit evidence, which, if admitted, might have induced the jury to find the degree of the crime to be no greater than that of manslaughter. But that evidence would not have warranted the jury to find anything less than that. There is, accordingly, no error in the record as to that degree of crime. We have a situation here, accordingly, similar to that which confronted us in State v. Sorrentino, 31 Wyo. 129, 224 Pac. 420, 34 A. L. R. 1477; State v. Sorrentino, 36 Wyo. 111, 253 Pac. 14, in which we reversed

the case so far as murder in the second degree was concerned, but affirmed it so far as manslaughter was concerned. We shall do the same here. And following the precedent set in that case, the State may elect by writing, filed in this case within thirty days, to take a new trial, in which event the judgment will be reversed and the cause remanded for a new trial. Unless that is done, the judgment will stand reversed as to murder in the second degree and affirmed for manslaughter, and the case will be remanded to the District Court with direction to cause the prisoner to be brought before it to be re-sentenced for that crime, taking into consideration the time already served by the defendant, and to make all other necessary orders not inconsistent herewith.

*Remanded with Directions.*

KIMBALL and RINER, JJ., concur.